**JOHNS–MANVILLE PRODUCTS CORPORATION, Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

No. 76–2444.

United States Court of Appeals, Fifth Circuit.

Aug. 19, 1977.

Rehearing and Rehearing En Banc Denied Oct. 26, 1977.

John D. O'Brien, Cleveland, Ohio, Michael J. Rybicki, Chicago, Ill., for petitioner-cross respondent.

Elliott Moore, Deputy Assoc. Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, John S. Irving, Gen. Counsel, Paul J. Spielberg, Supervisor, Howard E. Perlstein, Atty., N. L. R. B., Washington, D. C., for respondent-cross petitioner.

Before WISDOM, GEE and FAY, Circuit Judges.

FAY, Circuit Judge:

This case is before the Court on a petition for review and to set aside an Order of the National Labor Relations Board and on a cross-application by the Board seeking enforcement of its Order. The Board affirmed the findings and conclusions of the Administrative Law Judge and adopted his Order in its entirety,[1] holding that the petitioner, Johns-Manville Products Corporation, violated Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the National Labor Relations Act [the Act], as amended, 29 U.S.C. § 151 et seq.,[2] by unilaterally hiring permanent replacements for employees who had been lawfully locked out. As a remedy, the Board ordered, in addition to cease and desist provisions,[3] that the Company reinstate the one hundred and seven locked out bargaining unit employees with back pay and, upon request, to bargain with the Oil, Chemical and Atomic Workers International Union, AFL–CIO [the Union]. After carefully examining the record, this Court[4] finds that the Board erred in its conclusions. Therefore, we set aside the Board's Order and decline to enforce it.

## THE FACTS

The petitioner is engaged at its New Orleans plant in the manufacture of "organic felt," which is a crude form of paper used as a base for asphalt roofing products which the Company produces at its plants in Georgia, Louisiana and California. The procedure for making organic felt consists of a series of steps by which the two basic raw materials, waste wood chips and waste paper, are decomposed, blended with water, and then dried out to finally form paper sheets. Breaks in the paper, especially while still a damp "web", can be caused by striking the water mixture (the "slurry") or the finished sheet with one's finger or an object, or by changing the proper revolutions per minute of the rollers in the various dryer sections. Damage can also be caused by improperly adjusting the valves controlling the blending of paper and wood slurry stock. The evidence shows that sabotage in all these forms can be carried out

---

1. The Board's Decision and Order are reported at 223 NLRB No. 189 (1976).

2. The pertinent statutory provisions are as follows:

 29 U.S.C. § 158 [§ 8, National Labor Relations Act]

 (a) It shall be an unfair labor practice for an employer—

 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title . .

 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . .

 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title . . ..

3. "The Johns-Manville Products Corporation, Respondent herein, its officers, agents, successors and assigns, shall:

 1. Cease and desist from:
 (a) Discharging or otherwise discriminating against employees in regard to hire or tenure of employment, or any term or condition of employment because of protected concerted activities.
 (b) In any other manner interfering with, restraining or coercing employees in the exercise of their rights guaranteed in Section 7 of the Act except to the extent that such rights may be effected by lawful agreements in accord with Section 8(a)(3) of the Act."

4. This Court has jurisdiction under Section 10(e) and (f) of the National Labor Relations Act, 29 U.S.C. § 160(e) and (f).

surreptitiously, making it difficult if not impossible to observe the guilty individual or individuals.[5] Further, the large size of the physical plant precluded constant surveillance of the operations.[6]

After this Company purchased the New Orleans plant in 1964, the Union was certified by the Board as the unit employees' exclusive collective bargaining representative.[7] Since that time, the Company and the Union have entered into four successive two-year contracts, the latest of which was due to expire on October 12, 1973. Negotiations began in September 1973, following the Union's service of its 60-day notice of termination of contract. The parties met several times for the purpose of negotiating a new collective bargaining contract, but the parties could not agree in several areas.[8]

Prior to and during the negotiation period, the Company experienced an unusual amount of production disruption which became more widespread and serious as negotiations progressed. An inordinate number of paper breaks occurred on or about August 21 or 22, 1973 which were the result of improper adjustment of dryer section controls. On August 23, Darrell Wells, the

Company's Employee Relations Manager for the New Orleans plant, telephoned Ernest Rousselle, the Union's International Representative, and informed him of this problem. Wells said this type of activity could "only hurt negotiations" and that the plant was not going to continue to operate and make scrap. Rousselle replied that he would check with Local Union officials and get back to him. However, Rousselle did not contact Wells on this subject and the next time it was discussed was at a bargaining meeting held about two months later on October 3, 1973.

From September 1 through October 22, 1973, according to the record, the number of paper breaks during production periods was fifteen to twenty per week in contrast to one to three per week during periods when negotiations were not in progress.[9] Moreover, these breaks occurred on a daily basis and on all three shifts, with the excessive number of paper breaks generally coinciding with negotiation sessions.

Paper breaks were not the only problem. On the day before the October 3rd bargaining meeting, for example, the fine mesh stainless steel surface of a cylinder on one of the paper forming machines was "sharp-

5. Government witness St. Angelo testified that the sheets, particularly at the point just in front of the dryer section, can easily be broken and that this can be done without others in the vicinity observing it.

6. The operations are housed in five separate buildings having a total of approximately forty thousand square feet of floor space and are conducted by three shifts of employees per day.

7. A substantial number of these employees had worked for the former owner of the plant, Flintkote Company, and had been represented by the Union since 1947.

8. Apparently the most controversial proposal by the Company would have permitted it to hire mechanics from outside the bargaining unit, relieving it of the obligation to train maintenance department employees to do mechanics' work. The Company urged this proposal, contending that the lack of sufficiently trained maintenance people was affecting its maximum productivity. The Union opposed this change because it believed that senior maintenance employees would be laid off in favor of less senior, but more skilled mechanics hired from

the outside. The parties also disagreed on the duration of a new contract and a wage increase, the Company suggesting a three year contract and conceding to a 17, 20, and 25 cent wage increase per year, and the Union asking for a one year contract with a 30 cent wage increase each year. Further, in addition to other proposals from each side, the Company wanted to delete a no-strike, no slowdown, no work stoppage, and no lockout clause, and the Union wanted increased fringe benefits.

9. Based on the conflicting testimony presented at the hearing, the Administrative Law Judge found that the more accurate number of paper breaks during non-negotiating periods would be about eight per week:

I find the frequency rate of paper breaks during the nonnegotiating periods was about eight (8) per week, instead of three (3) per week as Respondent [the Company] contends, or considerably more per week as the employee witnesses contend. This figure makes allowance for inaccuracies and bias on the part of witnesses for both parties.

ly cut" along its circumference. James Weil, the Company's plant manager, testified that in thirty-five years experience he had never seen that kind of damage to a cylinder and that usually the type of damage resulting from wear and tear to such cylinders consists of dents or cuts, which are generally across the cylinder, rather than in the direction of its circumference. The repair of this cylinder cost approximately $4,000.

On the same day it was discovered that a 2,300 volt electrical switch had been opened or disconnected causing a complete shutdown of the mill. This switch is located in the defibrator building, separate and apart from the building in which excessive paper breaks were occurring. The uncontradicted testimony is that this incident could not have happened accidentally because the switch is held in a closed position, not only by a mechanical catch, but also by a heavy rubber band. Weil saw the switch in the open position with the broken rubber band on the floor. Despite the absence of the rubber band, the mechanical catch would have been sufficient to hold the switch closed, if it too had not been released.

As a result of the above described production disruption and damage, James Weil approached the Union's president, Mack Jordan, and asked him to see whether anything could be done about individuals tampering with equipment and causing production delays. Jordan was angered by Weil's request, did not respond to him, and took no affirmative action. At the negotiation meeting on the following day, October 3, 1973, Rousselle said he was "disturbed" because on the previous day Weil had accused Mack Jordan and other Union members of deliberately disrupting production.[10] Wells responded by saying that the Company would not tolerate a continuation of disruptions in production and that they interfered with "the climate of the negotiations". Wells then made an "official" request of

the Committeemen that they see to it that production disruptions cease immediately. None of them made any reply to this request.

Immediately thereafter, a vibration developed in one of the three defibrators, requiring it to be shut down. Ball bearings were discovered between its rotating grinding discs.

Sometime about October 11, 1973, the Union held a strike vote among the bargaining unit employees and Rousselle thereafter applied to the International for strike authorization which it granted on October 23, 1973. Although a strike vote had been taken and a strike authorized, Rousselle admitted he never presented any Company offer to the rank and file for a vote.

At the October 12th negotiation meeting, the parties had reached a bargaining impasse.

By October 11th and 12th, paper breaks on both forming machines were so frequent that the machines became inoperable because the pits beneath them were filled with scrap paper. At this point the Company decided to cease operations and lay off 70–80 production employees for a few days. During this time a maintenance crew checked and repaired all the machinery, determining that the recent paper breaks and other problems were not the result of machinery or equipment malfunctioning. Weil testified:

> I found as a result of the shut down . . . there was nothing found during that period of time that would have contributed to the vast number of breaks that we had on the machines.

The Company recalled production employees on October 22nd in the hope that operations would return to normal. However, sabotage of products and equipment reached a crescendo on that date. The record shows that all three defibrators were jammed with junk metal and had to be shut

---

**10.** At the meeting, Rousselle also explained that several months earlier he showed the Company a large piece of metal which was found in the raw materials, and that Mr. Weil had stated at that time that the Company was purchasing the paper chips from any place they could get them and that the Company was not accusing the employees of causing the breakdowns which resulted from the foreign materials.

down and that there was a multitude of paper breaks. The Government's rebuttal witness Donald Hall agreed the situation was "unusual." On his 3:00 p. m. to 11:00 p. m. shift there were as many as six breaks an hour on one machine. Paper breaks on the 22nd were so numerous that in the twenty-four hour period on that date, only thirteen and one-half tons of felt were produced, compared to normal daily production of one hundred and ten to one hundred and twenty tons.

Jim Weil, an expert with over thirty years experience in the paper industry, testified that if the scrap metal found in the bins and screw conveyor chamber had worked its way to the grinding surfaces of the discs, they would have caused an explosion which could have severely damaged the machine and endangered human lives.

Due to the continuing sabotage, it was decided between October 22 and October 31 that plant operations could not continue without serious risk to lives and property. On October 31, 1973, the Company held a meeting first with the Union Committee and then with all the production employees, informing them that it had been decided to discontinue operations with bargaining unit personnel until a contract was agreed upon. A letter to this effect was also sent by registered mail to the home of each employee. The Company's spokesmen explained that the decision to lay off the employees had been made primarily to protect the employees' safety and to preserve the Company's assets. Additional reasons given for the lock-out were the Union's unreasonable demands, unresponsive attitude and willful acts, as well as the history of sabotage during prior negotiations between the parties.[11] When the Company representatives finished speaking, Union Representative Rousselle stated, "You let us go before and we will go again. . . . We can hold out to any amount of pressure you can give us. We will not settle for any less than the other plants." A Union Committeeman added, "We don't care if you shut the plant down for six months."[12]

The plant was indeed shut down and the production employees laid off. On November 14, 1973, the Company resumed partial operations using temporary replacements and employees loaned by the Company's other plants.

The parties continued to meet for the purpose of negotiating a new contract. On November 14, 1973, the same day the Company resumed partial production with temporary replacements, the Company presented an improved proposal to the Union. The Union rejected the Company's proposal and offered a counterproposal, which the Company rejected. Subsequent meetings were held on November 27 and November 30, 1973, and on January 23 and March 20, 1974, but the impasse continued.

Reports to the Company concerning the output and profitability of the New Orleans operation during the time when temporary replacements were being used indicated that the Company was losing approximately $300,000 per month in pre-tax profits. Further, due to vastly reduced output, the Company had been forced to curtail opera-

11. Testimony at the hearing before the Administrative Law Judge shows that similar incidents of sabotage had occurred in earlier negotiations. During ten weeks of the negotiations resulting in the 1965 contract, there was an average of 9.3 paper breaks per week. In the 1969 negotiations there was a forced shutdown from October 11 through October 27 because fifteen to twenty paper breaks during the week of October 6 had caused the pits to fill up. During the 1971–72 negotiations, paper breaks averaged fifteen to twenty per week from January, 1972 until May or June, 1972 when the contract was settled.

12. The six month time period refers to the maximum period the employees might be eligible for unemployment compensation benefits, assuming it was determined that the employees were not involved in a labor dispute. From the end of October through the month of April, eighty-eight of the one hundred seven members of the bargaining unit applied for and were awarded such benefits, see *Johns-Manville Products Corp. v. Doyal et al.*, 510 F.2d 1196 (5th Cir. 1975). Employees received 54% of their average gross weekly pay. In addition to unemployment benefits the Union also provided the employees with weekly benefits, characterized by Rousselle as "lock-out benefits."

tions at two other plants which relied on New Orleans for paper. The record reveals that the Company representatives involved in negotiations or responsible for the New Orleans operation met together after the March 20th negotiations to consider the alternatives. According to the testimony, there were four reasons for their conclusion that the only course left was to hire permanent replacements: (1) with contract negotiations stalemated, it did not seem reasonable to resume operations with bargaining unit employees without a contract, based on the history of sabotage and disruption preceding the lay-off on October 31, 1973; (2) the use of salaried employees and temporary hourly replacements was not producing the required volume and the costs were excessive; (3) the Company was suffering an economic loss of between $280,000 and $300,000 per month, which from November 1, 1973 through March 31, 1974, amounted to a total of about $1.5 million; and (4) the adverse effect the New Orleans labor dispute was having on other plants within the residential products division, including a decrease in the number of employees and days of operations.

After the Company decided it was necessary to hire permanent replacements, it started interviewing applicants. Although seven new people started working the second week of April, 1974, the full one hundred seven employees were not replaced until late June or early July. On June 12, 1974, before the workforce was completely replaced, the parties met and bargained, but without success.

### FINDINGS

The role of this Court in reviewing the order of the National Labor Relations Board is to determine whether the Board's decision is supported by substantial evidence on the record as a whole,[13] or is a proper application of the law.[14] This Court has the utmost respect for findings and conclusions of the Board, but recognizes that their judgment is not "the last word." As the Supreme Court stated in *N.L.R.B. v. Brown*, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965):

It is argued, finally, that the Board's decision is within the area of its expert judgment and that, in setting it aside, the Court of Appeals exceeded the authorized scope of judicial review. This proposition rests upon our statement in *Buffalo Linen [Labor Board v. Truck Drivers Union,* 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957)] that in reconciling the conflicting interests of labor and management the Board's determination is to be subjected to "limited judicial review." 353 U.S., at 96 [77 S.Ct. 643]. When we used the phrase "limited judicial review" we did not mean that the balance struck by the Board is immune from judicial examination and reversal in proper cases. Courts are expressly empowered to enforce, modify or set aside, in whole or in part, the Board's orders, except that the findings of the Board with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. National Labor Relations Act, as amended, §§ 10(e), (f), 29 U.S.C. §§ 160(e), (f) . . . . Courts should be "slow to overturn an administrative decision," *Labor Board v. Babcock & Wilcox Co.,* 351 U.S. 105, 112 [76 S.Ct. 679, 100 L.Ed. 975], but they are not left "to 'sheer acceptance' of the Board's conclusions," *Republic Aviation Corp. v. Labor Board,* 324 U.S. 793, 803 [65 S.Ct. 982, 89 L.Ed. 1372]. Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. Such review is always properly within the judicial province, and courts would abdicate their responsibility

---

13. *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 983, 13 L.Ed.2d 839, 849 (1965); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

14. *Labor Board v. Wilcox Co.*, 351 U.S. 105, 112–13, 76 S.Ct. 679, 100 L.Ed. 975 (1956); *NLRB v. Insurance Agents Intern'l Union*, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960).

if they did not fully review such administrative decisions. Of course due deference is to be rendered to agency determinations of fact, so long as there is substantial evidence to be found in the record as a whole. But where, as here, the review is not of a question of fact, but of a judgment as to the proper balance to be struck between conflicting interests, "[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." *American Ship Building Co. v. Labor Board*, [380 U.S. 300, 318, 85 S.Ct. 955, 957, 13 L.Ed.2d 855 (1965)] [footnote citation omitted]. 380 U.S. 278, 290–92, 85 S.Ct. 980, 987, 13 L.Ed.2d 839.

 In the instant case the Board, in accordance with the finding of the Administrative Law Judge, held that "the evidence in this record is insufficient to support a conclusion and finding that [the Company's] employees engaged in an in-plant strike or in concerted improper conduct so as to enable it to replace or discharge its entire complement of production employees." We agree with the factual findings of the Administrative Law Judge and the Board, but not with the conclusions they reached.

Based on the facts as discussed above, this Court finds that, as a matter of law, the employees were involved in what amounted to an in-plant strike. The employees' conduct was so severe that we cannot help but find that their behavior was tantamount to a strike and forced the Company to lock them out. The Company's reaction had a valid, substantial business justification and there was no anti-union motivation indicated by the record or found by the Board or asserted by the Union. The history of the relationship between the parties reveals the Company's continuing desire to negotiate and full recognition and acceptance of the Union, notwithstanding numerous incidents of prior sabotage by the employees. In the most recent negotiation period, Company management on at least two occasions requested Union officials to see if something could be done about individuals causing damage and disruptions; the Union never responded, or expressly denied the allegations. In the interest of public policy and industrial peace, we cannot condone behavior which causes actual and substantial damage to property or potential, serious injury to human lives. Although employees and employers are permitted to choose their own weapons in the bargaining battle,[15] the employees in the instant case went too far. Since we find their actions amounted to a strike, the Company's subsequent lock-out and hiring of permanent replacements were not violative of the National Labor Relations Act, including Sections 8(a)(1), (3) and (5). *National Labor Relations Board v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938).[16] This conclusion pre-

---

**15.** Quoting from *NLRB v. Insurance Agents*, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960), the Supreme Court has stated:

Our decisions hold that Congress meant that *these* activities [attempting to exert economic strength], whether of employer or employees, were not to be regulable by States any more than by the NLRB, for neither States nor the Board are "afforded flexibility in picking and choosing which economic devices of labor and management would be branded as unlawful." . . . Rather, both are without authority to attempt to "introduce some standard of properly 'balanced' bargaining power," . . . or to define "what economic sanctions might be permitted negotiating parties in an 'ideal' or 'balanced' state of collective bargaining." *Lodge 76, Etc. v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 96 S.Ct. 2548, 2557, 49 L.Ed.2d 396 (1976).

See also, *Inter-Collegiate Press v. NLRB*, 486 F.2d 837, 847 (8th Cir. 1973) ("Neither the Board nor the courts should sit as arbiters of the permissible economic weapons available to the parties in a labor dispute"); *NLRB v. Dalton Brick & Tile Corp.*, 301 F.2d 886, 895 (5th Cir. 1962).

**16.** In *Mackay Radio*, the Supreme Court held that it was not an unfair labor practice for the employer to replace his striking employees with other employees in an effort to carry on his usual business and neither was the employer bound to later discharge the more-recently-hired employees in order to reinstate the strikers. However, the employer was found to have committed an unfair labor practice in violation of § 8 of the National Labor Relations Act

cludes the necessity of considering the other issues raised by the parties,[17] particularly the question of whether an employer may

permanently replace locked out employees after bargaining impasse.[18]

when he discriminated against certain of the strikers by refusing to rehire them for the sole reason that they had been active in the union.

**17.** The Administrative Law Judge and the Board in the instant case determined that the employees were not engaged in an in-plant strike or concerted action sufficient to justify the Company's permanently replacing them without notice after a lawful lockout and bargaining impasse; that such action tilted the scales out of balance with respect to bargaining power; and that such action also rendered more than a slight adverse effect upon the employees' protected rights, as compared with the Company's legitimate business purpose and its lockout bargaining leverage. The Administrative Law Judge further found, and the Board agreed, that the Company's action was so inherently discriminatory and destructive of the employees' rights that such action constituted a per se violation of Section 8(a)(1) and (3) of the Act. It was further held that the hiring of permanent replacements in effect constituted a withdrawal of recognition of the employees' elected bargaining representative and was indicative of bad faith bargaining or refusing to bargain on the part of the Company, all in violation of Section 8(a)(5) of the Act.

In passing we would like to note that when certain conduct by an employer is found to be "inherently destructive" of employees' rights, the conduct is deemed to be a per se violation and it is unnecessary to examine the employer's intent behind that conduct in order for the employer to be guilty of having violated the Act. When the employer's conduct is not inherently destructive but rather has only a comparatively slight impact or slight adverse effect on employees' rights, then intent becomes an important issue. If there is subjective evidence of anti-union motivation, then the employer has committed a violation. In the absence of anti-union motivation, a balancing test is done to determine whether the employer's legitimate business reasons outweigh the effect on the employees' protected statutory rights. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 380, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); *NLRB v. Brown*, 380 U.S. 278, 287, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965). Because the Board and the Administrative Law Judge held the conduct of the employer in the present case to be a per se violation, there was no need to go any further. But as long as they attempted to perform the balancing test, we observe the instruction of judicial precedent that neither the Board nor the courts are permitted to choose the weapons or balance the bargaining power of the parties beyond that delineated by Congress in the Na-

tional Labor Relations Act and other federal and state labor law. See n. 15 *infra*. As noted in the text, however, due to our disposition of the case before us, we need not reach these issues.

**18.** In *American Ship Bldg. v. Labor Board*, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), the Supreme Court held that an employer does not commit an unfair labor practice under the Act when, after an impasse in negotiations has been reached, he temporarily shuts down his plant and lays off his employees for the sole purpose of applying economic pressure in support of his bargaining position. However, in a footnote, the Court expressly reserved ruling as to the consequences that would follow if an employer replaced his employees with permanent replacements or temporary help. *Id.* at n. 8.

This Court in *National Labor Relations Board v. Dalton Brick and Tile Corp.*, 301 F.2d 886 (5th Cir. 1962), upheld the use of a lockout for legitimate bargaining purposes when not accompanied by any anti-union animus.

The Eighth Circuit went one step further by holding that an employer's conduct in hiring temporary replacements during a lawful lockout was not "inherently destructive" of employees' rights and, balanced on the facts presented in that case, was not a violation of the Act. *Inter-Collegiate Press v. NLRB*, 486 F.2d 837 (8th Cir. 1973), cert. denied, *Bookbinders Local No. 60 v. NLRB*, 416 U.S. 938, 94 S.Ct. 1939, 40 L.Ed.2d 288. This approach was adopted by the Administrative Law Judge in the instant case in reference to the hiring of temporary employees after the lockout, with no party challenging it.

One year ago in *Lodge 76, Intern'l Assoc. of Machinists and Aerospace Workers, AFL–CIO v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), the Supreme Court considered federal preemption of state regulation of a group of employees' concerted refusal to work overtime while a new contract was being negotiated. After holding that the state was preempted from regulating such conduct (although such conduct was not expressly protected or prohibited by the Act), the Supreme Court stated:

Moreover, even were the activity presented in the instant case "protected" activity within the meaning of § 7, economic weapons were available to counter the union's refusal to work overtime, *e. g.*, a lockout, *American Ship Building Co. v. NLRB*, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855, and the hiring of permanent replacements under *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). [footnote omitted]. 96 S.Ct. at 2559.

Johns-Manville's petition to set aside the order of the National Labor Relations Board is hereby granted and the Board's cross-petition for enforcement of said order is hereby denied.

WISDOM, Circuit Judge, dissenting:

I must respectfully dissent.

The Court today infers that an in-plant strike occurred at the Johns-Manville paper plant in New Orleans despite contrary factual conclusions by the administrative law judge and the National Labor Relations Board.[1] As I read the record, substantial evidence *does* support the Board's conclusion that the company violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act. Here, the company could not identify a single worker who participated in the alleged strike and could not even determine with reasonable definiteness when the strike occurred. With deference, I submit that the Court's holding is both factually and legally erroneous.

Because of its finding that there was an in-plant strike, the majority did not reach the difficult question whether a company may permanently replace locked-out workers. I would reach this question and hold that the replacement of these workers without notification violated sections 8(a)(1) and 8(a)(3) of the Act.

## I.

The majority opinion relies [2] on the factual inference that all or a majority or a

---

Although we adhere carefully to the words of the Supreme Court we would not say at this time that the above statement clearly indicates whether the hiring of permanent replacements in the absence of a strike (as in *Mackay, supra,* n. 16) would be a violation of the Act.

1. The administrative law judge found:

Consequently, based upon the foregoing credible evidence, legal authority, and reasons, while I conclude and find such evidence sufficient to legally justify the respondent's lockout of its employees to impose economic pressure upon them in an effort to advance its bargaining position, on the one hand, and to protect its legitimate and substantial business operations from frequent disruptive operations on the other, I nevertheless do not find such evidence sufficient to support a conclusion and finding that respondent's employees were engaged in an in-plant "strike," so as to enable it to replace or discharge its entire complement of production employees.

In view of the fact that such disruptive acts could have been performed by any one employee, acting independently and not on behalf of any other employee or the Union; that the evidence of record fails to show that respondent conducted any in-plant investigation in an effort to ascertain who was responsible for such disruptive activities; that the respondent did not introduce any evidence which identified any employee who was even alleged to be responsible for such activities, I am thereby persuaded that the respondent did not have reasonable and sufficient objective considerations upon which to conclude that any or all of its employees were engaged in improper and unlawful conduct or concerted activity, so as to justify its replacement or discharge of all of its production employees, innocent or guilty alike.

The Board adopted the findings, conclusions, and recommended order of the administrative law judge. One member of the Board, dissenting, stated:

I join my colleagues in finding that respondent violated Section 8(a)(3), (5), and (1) of the Act by permanently replacing its entire complement of locked-out unit employees. However, contrary to my colleagues, I would find in accord with my dissenting opinions in *Ottawa Silica Company,* 197 NLRB 449 (1972), and *Inter Collegiate Press, Graphic Arts Division-Sargent Welch Scientific Co.,* 199 NLRB 177 (1972), that Respondent violated Section 8(a)(1) and (3) by operating its plant with temporary replacements for its locked-out employees from November 1973 until April 1974, when it discriminatorily replaced the locked-out employees with permanent employees.

2. The conclusory nature of the majority opinion creates an ambiguity in the Court's holding. The majority declares that an "in-plant strike" occurred because someone or a number of employees must have committed acts causing the production disruptions. The opinion does not reveal, however, whether this "strike" is concerted protected activity or unprotected activity under section 7 of the Act, 29 U.S.C. § 157 (1970). The opinion does not indicate whether the inferred strike is the equivalent of a strike voted by the majority of the members of the union or whether it is the equivalent of concerted activity by a minority. If the assumed action by the workers amounts to concerted minority action, the opinion does not explain whether the action supports a clearly articulated union position or whether the union has organized or supported the activity. *See NLRB v. Shop Rite Foods, Inc.,* 5 Cir. 1970, 430 F.2d 786. The legality of the assumed worker con-

substantial minority of the workers at the plant sabotaged production from August through October 1973. The inference is drawn from several occurrences and, according to the majority, flows from the facts as found by the administrative law judge. First, the Court concludes that an unusual number of paper breaks or tears occurred as the paper was processed in August, September, and October. Because the increase in breaks was supposedly so great and coincided with negotiations for a new contract, the Court concluded that the workers caused the disruptions. Second, the Court concluded that metal periodically found lodged in production equipment was inserted by the workers. Third, the majority says that the workers disconnected a power switch and cut a cylinder on a paper dryer.

The union emphatically denied that its unit employees engaged in disruptive activities in the plant. The facts that the administrative law judge found relating to these occurrences do not support the inference that all or a majority or even a substantial number of employees participated in any plant sabotage. Instead, the record provides substantial evidence in support of the Board's decision that no worker had been sufficiently linked to unprotected conduct to justify his dismissal or replacement.

*The Paper Breaks.* The company and the majority of the Court base their argument that an in-plant strike occurred primarily on the assertion that the workers disrupted production by causing paper breaks. Although the majority says that it accepts the factual findings of the Board, its adoption of the company's version of the facts belies the asserted deference and ignores substantial evidence supporting the Board's findings. For example, the parties disputed the average number of paper breaks occurring during non-negotiating periods. The company contended that about three breaks occurred each week. Workers, including utility men who would re-thread machines after breaks, testified that as many as twenty breaks occurred each week. After considering all of the testimony, the administrative law judge found that the paper probably broke about eight times in an average week. Yet the majority bases its decisions on the company's estimate of three a week without demonstrating why the facts do not support the administrative law judge's finding.[3]

If the administrative law judge's facts are used, the company experienced less than one additional paper break per shift during August through October 1973. This is not a significant increase and disproves the contention that a substantial number of workers participated in concerted activity. In-

duct, as well as the legality of the employer's response, depends in part on these unanswered questions.

3. In cases where company records provide a clear picture of industrial activity, perhaps reliance on company information and disregard of testimony by workers would be justified. But here, the majority is not relying on records accumulated in the regular course of business. Instead, data supporting the majority's contentions come from the personal diary of the plant production manager, hardly an unbiased observer in the dispute. The company fortuitously destroyed its records about the paper breaks even though the impasse continued at the time of destruction. The administrative law judge found:

Paper breaks are caused by several unintentional factors as well as by intentional acts; that the frequency of such paper breaks, though somewhat stabilized during

nonnegotiating periods, was nevertheless erratically unstable on some occasions during the same period; that anyone, or a combination of employees, can intentionally or unintentionally cause paper breaks by improperly adjusting the heat or revolutions of the dryer machines, by varying the paper mixture formula, or by striking the paper with the hand or an object; and that since Manager Weil's testimony on the frequency of paper breaks was not from official company records, and additionally, was in conflict with the testimony of some of the employees who operated the machines daily, I find the frequency rate of paper breaks during the nonnegotiating periods was about eight (8) per week, instead of three (3) per week as respondent contends, or considerably more per week as the employee witnesses contend. This figure makes allowance for inaccuracies and bias on the part of witnesses for both parties.

deed, as the administrative law judge concluded, the more reasonable inference is that the workers were not responsible for the breaks or that one or two dissidents caused the disruptions.

The inference that a substantial number of the workers did not create the disruptions is bolstered by the history of mechanical problems that periodically caused increases in breaks. The record contains evidence of unusually frequent breaks in January, May, and July of 1973, long before any negotiations. An employee testified that excessive breaks in January caused the company to change its policy about shutting down machines to remove paper after a break. Before January 1973, management relied on regular cleaning crews to pick-up the waste. But the increase in breaks in early 1973 prompted the company to grant supervisors the discretion to order paper removed from scrap pits.

The Board's findings are also supported by the failure of the company to attempt to identify any individual as a saboteur. The majority justifies this failure to identify even one worker who disrupted production by asserting that detection was impossible. Here again, the majority has accepted the company's story without critical analysis. Most importantly, the failure by the company even to attempt to find a worker in an act of sabotage or to identify a saboteur in some way prevents the conclusion that detection was "difficult if not impossible". It

seems to me that if the disruptions were as serious as the company alleged, the facts suggest that detection was probable and that the company should have resorted to serious attempts at surveillance. With 107 production employees, management had to supervise only 35 workers on each shift. Supervisors were in the plant; guards could have been added.[4] Although the majority contends that the expanse of the plant prevented adequate supervision, the facts do not show that the disruptions occurred in all of the buildings. Instead, they occurred in only three.[5] If the breaks were as numerous as the majority contends, a tally of them might have revealed a pattern permitting further narrowing of the scope of supervision. Because the company destroyed all records about these disruptions (company policy requires records to be kept for one year), it could not now determine whether the breaks usually occurred in the vicinity of particular workers. Nevertheless, the facts provide little support for the contention that detection was impossible at the time when the information was available. The reasonable inference is that the company failed to identify any saboteurs because the small increase in breaks did not warrant an investigation.[6]

Finally, the majority relies on production figures to show that the disruptions were widespread during the negotiations. Yet the only figure cited is 13½ tons, the production for October 22, when all parties

4. The employer in *NLRB v. Shop Rite Foods, Inc.,* 5 Cir. 1970, 430 F.2d 786, 787, hired guards to catch suspected saboteurs. When a supervisor eventually caught an employee cutting sacks of flour, the worker was fired for engaging in conduct not protected by the Act.

5. The majority also accepted the company's contention that paper breaks were easy to make and therefore undetectable. The administrative law judge recognized the ease with which breaks occurred. The delicate nature of the production process also supports the administrative law judge's conclusion that mechanical problems could have caused the breaks as easily as disgruntled workers. That the company checked the machinery in October and found no obvious mechanical problems does not upset this inference. Because the records about the breaks have been destroyed,

we cannot assess the accuracy of the mechanical check. In addition, paper breaks increased during other non-negotiating periods, and no mechanical causes appeared. If the breaks were as easy to cause and impossible to detect as the company contends, workers engaged in concerted plant sabotage probably would have created more disruptions than actually occurred.

6. Even though the majority excuses the company's failure to investigate, the opinion relies in part on the failure of the union to react to the disruptions. The union, however, had less access to the plant and company records than management. I would not condemn the union for not uncovering the saboteurs, when the company failed even to investigate the sources of the alleged sabotage.

agree that an unusual number of breaks occurred.[7] The record shows, however, that October 22 was the only day when the company experienced a substantial loss of production. The average output of the plant was 110 tons a day during non-negotiating periods. In August, September and October 1973, the critical period, production ranged from 104 tons a day to 112 tons a day. Despite these figures, the majority concludes that an in-plant strike occurred at some unspecified time during the period. We are therefore asked to believe that a substantial number of unidentified employees engaged in concerted industrial sabotage that was easy to accomplish and impossible to detect, and yet that the employees met or exceeded the average output of the plant. It is not surprising that the majority and the company have such a difficult time attempting to establish the date of this strike or the identity of the strikers. As the Board concluded, the facts do not demonstrate that a strike occurred.

*The Metal.* The majority submits that the workers sabotaged the plant by inserting scrap metal into the machinery. Specifically, the opinion states that the workers inserted ball bearings into a grinder shortly after the October 3 bargaining session. How the majority determined that workers had placed the metal in the production process is unclear. No direct evidence supports that conclusion. Even the company, at the October 3 bargaining session, acknowledged the more reasonable inference that small pieces of metal such as ball bearings were probably mixed with the wood chips ground to make paper slurry. After union officers, pointed out instances of metal damage in August, including the jamming of a defibrator with ball bearings, company officials admitted that the company was not accusing its employees of placing metal in the wood. As of October 3, then, the facts do not support the inference that any worker

engaged in an in-plant strike by jamming machinery with metal. During the period after October 3, the evidence connects no individual worker to the metal jams, and the majority fails to specify when the introduction of foreign materials into the production process amounted to a strike. Because the number of jams and the amount of metal was so small, the Board's conclusion that one or two disgruntled employees caused the jams finds substantial support in the record.

*The Power Switch and Damaged Cylinder.* The record contains no direct evidence as to the cause of either the disconnecting of a major power switch or the cutting of a wire mesh cylinder on October 2. The majority uses the incidents to support its theory of an in-plant strike. Both occurrences support the Board's conclusion that only one or two workers acting independently created several of the disruptions. It takes only one person to throw a switch or to cut a cylinder. If a group had been involved in either incident, the participants probably would have been detected. The majority has therefore failed again to demonstrate that a substantial number of employees sabotaged the plant or otherwise engaged in an in-plant strike.

On these facts the Court concludes that "the employees in the instant case went too far"; they struck and may be replaced. Wherever the employees "went", as a matter of fact the entire workforce did not strike, and there is no evidence that a substantial number of employees struck. The facts prove no more than that one or two or a handful of workers may have created a few production disruptions, most of them occurring on October 22, 1973. The facts do not show *who* "went too far" or *when* they went there. Consequently, the facts do not show a strike by anyone. Instead, the record shows that substantial evidence supports the conclusion of the administrative

7. On October 22 workers returned to work after the company had locked them out to check machinery. The labor dispute had reached its peak by then; the parties had reached an impasse. If the company seriously expected

widespread worker sabotage, it should have expected disruptions on the twenty-second. Yet management still made no attempt to identify the saboteurs.

law judge and the National Labor Relations Board that the company identified no worker as actually connected to any misconduct justifying replacement or dismissal.[8]

## II.

The majority declares that a strike occurred as a matter of law at the Johns-Manville plant. This holding is unprecedented. The Court cites no section of the Act, no decision of a court, no holding of the Board, and no argument of labor policy in support of its conclusion. There is no citation because no supporting case exists. Both law and policy compel the conclusion reached by the Board that action may not be taken against in-plant strikers until the participating workers are identified.

The first legal error made by the majority, if I may say so with deference, is its confusion of unprotected employee activity with protected activity. The Court says that an "in-plant strike" occurred as a matter of law. Participation by workers in an in-plant strike has consistently been regarded as unprotected concerted activity.[9] In this case the sabotage asserted by the company would, if proved, be deemed unprotected because it allegedly interfered with the company's rightful use of its property, damaged the property, and endangered lives.[10] When the majority addresses the validity of the permanent replacement of the workers, however, it grants its approval with citation only to *NLRB v. Mackay Radio & Telegraph Co.*, 1938, 304 U.S. 333, 58

S.Ct. 904, 82 L.Ed. 1381, a case involving an ordinary strike protected by section 7 of the Act. The Court's reasoning therefore yields the following conclusion: concerted activity outside the protection of the Act by unidentified workers permits the inference that the entire workforce engaged in protected concerted activity. I cannot buy this. The lack of logic or policy in this inference explains why the proposition is unique in America labor law.

As its second legal error, the Court approves company action against all of its production employees even though no individual has been specifically connected with any concerted activity, protected or unprotected. *Mackay* approved the permanent replacement only of workers who were identified as striking. 304 U.S. at 337, 345, 58 S.Ct. 904. Similarly, companies have been permitted to respond unilaterally to unprotected activity only when the participating workers have been identified. In *Stewart Die Casting Corp. v. NLRB*, 7 Cir. 1940, 114 F.2d 849, *cert. denied*, 1941, 312 U.S. 680, 61 S.Ct. 449, 85 L.Ed. 1119, for example, a sit-down strike by unidentified employees preceded a general strike by the entire workforce. The company argued that the employment relationship with all the workers had terminated, not just the relationship with those who had participated in the sit-down strike. The Court of Appeals rejected the contention:

> In this connection, it is also pertinent to observe that the record, with the exception of twelve or fourteen Board wit-

8. As set out in section II of this opinion, the case law does not support the holding that in-plant concerted activity damaging company property is protected under section 7. Consequently, the majority opinion would appear to justify other disciplinary action by the company, including the firing of all of the workers.

9. *E. g. NLRB v. Fansteel Metallurgical Corp.*, 1939, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (takeover and damage of employer's property by workers); *NLRB v. Clinchfield Coal Corp.*, 4 Cir. 1944, 145 F.2d 66 (interference with employer's operation of its mining facilities); *Honolulu Rapid Transit*, 1954, 110 NLRB 1806 (intermittent on-the-job strikes); *Elk Lumber Co.*, 1950, 91 NLRB 333 (slowdown); *cf. NLRB*

*v. Shop Rite Foods, Inc.*, 5 Cir. 1970, 430 F.2d 786 (action by a minority of workers in a unionized plant); *NLRB v. Draper Corp.*, 4 Cir. 1944, 145 F.2d 199 (action by a minority of workers in a unionized plant).

10. Recently, the Supreme Court suggested that partial strikes may not always be deemed unprotected under section 7. *Lodge 76, Int'l Ass'n of Mach. & Aero. Wkrs. v. Wisconsin Employment Relations Comm'n*, 1976, 427 U.S. 132, 152 n. 14, 96 S.Ct. 2548, 49 L.Ed.2d 396. But the Court also approved cases such as *Fansteel* in which activity interfering with the company's use of its property or damaging the property was denied protection.

nesses who admitted they participated in the sit-down strike, is silent as to who were the participants. In fact, it is shown with no certainty as to the number who participated. Petitioner's president estimated the number at 75, the Board found "about 100" and some of the witnesses placed the number as high as 150. . . . Certainly all of the employees should not be deprived of the benefits of the Act because certain undisclosed ones forfeited their rights.

*Id.* at 856.

The reasoning of *Stewart Die Casting* is consistent with all other reported cases involving unprotected concerted activity by a minority of employees,[11] unprotected sit-down strikes,[12] unprotected slow-down ac-

tions,[13] and unprotected displays of violence by workers.[14] In no case has a company been permitted to discipline, replace, or fire workers who did not participate in the activity. The picket line violence cases are particularly instructive because the courts have required clear identification of the offending workers before action may be taken against them. In *NLRB v. Mt. Clemens Pottery Co.,* 6 Cir. 1945, 147 F.2d 262, for example, the company argued that it had no duty to reinstate any unfair labor practice striker because violence had erupted during the strike. The Court of Appeals concluded that only two workers had committed acts that would justify denying them reinstatement. As for the other workers, "the violence of these two employees, so clearly established by their convic-

---

11. *E. g. Emporium Capwell Co. v. Western Addition Community Org.,* 1975, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (Strikers were identified as they picketed the plant.); *NLRB v. Shop Rite Foods, Inc.,* 5 Cir. 1970, 430 F.2d 786 (Strikers were identified when they failed to time-in for work.); *NLRB v. Sunbeam Lighting Co.,* 7 Cir. 1963, 318 F.2d 661 (Only the 50 workers who walked out in a wildcat strike were discharged.); *C. G. Conn, Ltd. v. NLRB,* 7 Cir. 1939, 108 F.2d 390 (Workers were identified as they walked out.); *Terry Poultry Co.,* 1954, 109 NLRB 1097 (Only two workers who left the assembly line to present a grievance to management were discharged.).

12. *E. g., NLRB v. Fansteel Metallurgical Corp.,* 1939, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (The company fired only the workers who participated in the violent sit-down strike.); *NLRB v. Clinchfield Coal Corp.,* 4 Cir. 1944, 145 F.2d 66 (The company fired only the workers who had blocked the entrance to the mine with a coal car.); *Stewart Die Casting Corp. v. NLRB,* 7 Cir. 1940, 114 F.2d 849 (The company could not discipline the entire workforce for a sit-down strike launched by an undetermined number of the workers).

13. *E. g., Harnischfeger Corp. v. NLRB,* 7 Cir. 1953, 207 F.2d 575, (The company discharged only the three men who led a partial, intermittent work stoppage.); *Honolulu Rapid Transit Co.,* 1954, 110 NLRB 1806 (The company discharged only those drivers who did not report for work during intermittent work stoppages.); *Elk Lumber Co.,* 1950, 91 NLRB 333 (The company fired only those workers who slowed the pace of their work and discussed the slowdown with management.).

14. *E. g., Seminole Asphalt Refining, Inc. v. NLRB,* 5 Cir. 1974, 497 F.2d 247 (The Court refused to enforce a Board order of reinstatement only after concluding that the three workers had actually participated in violence); *W. J. Ruscoe v. NLRB,* 6 Cir. 1969, 406 F.2d 725 (The identification of workers who participated in violence included photographs of the activity); *Oneita Knitting Mills, Inc. v. NLRB,* 4 Cir. 1967, 375 F.2d 385 (The company could not alter the seniority of returning strikers but could fire a worker who drove a car from which eggs were thrown. The Court required reinstatement of a worker who was not sufficiently connected by the facts to the egg throwing.); *NLRB v. Clearfield Cheese Co.,* 3 Cir. 1954, 213 F.2d 70 (Reinstatement after an unfair labor practice strike was denied only to 21 employees who were clearly identified as participants in picket line misconduct); *NLRB v. Mt. Clemens Pottery Co.,* 6 Cir. 1945, 147 F.2d 262 (The Court refused to impute the violence of two employees to the rest of the workforce.); *Republic Steel Corp. v. NLRB,* 3 Cir. 1939, 107 F.2d 472, modified on other grounds, 1940, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (Workers denied reinstatement were identified by criminal convictions.); *Alcon Cable West,* 1974, 214 NLRB 236 (One worker may be terminated because the facts sufficiently connected him to violence; another worker, who participated only in the isolated incident, could not be terminated.); *Jai Lai Cafe,* 1973, 200 NLRB 1167 (The two employees terminated had engaged in mass picketing, had placed nails in the road to puncture tires, and verbally had abused customers and other workers.); *Berkshire Knitting Mills,* 1943, 46 NLRB 955 (When the company could not prove that several employees had engaged in misconduct, the Board prevented their discharge.).

tions, is not, however, to be imputed to other union members in the absence of proof that identifies others as participating in such violence". *Id.* at 267. Yet the violence and sabotage that the Johns-Manville management says occurred at its plant are imputed to the entire workforce with no evidence identifying any participant. The Court's holding disregards thirty years of contrary precedent supporting the Board's decision.

The implication of the in-plant strike also violates the labor policy embodied in section 7 of the Act[15] in that it inhibits future unionization and collective bargaining. Workers have the right to bargain collectively, to unionize, and to refuse unionization without coercion. The origin of these rights is the policy judgment by Congress that the settlement of labor disputes by collective bargaining will diminish industrial strife. The proper role of the Board and the courts, therefore, is to protect the process of collective bargaining and the freedom of workers to decide whether to unionize. *American Ship Building Co. v. NLRB*, 1965, 380 U.S. 300, 308–09, 85 S.Ct. 955, 13 L.Ed.2d 855; *Inter-Collegiate Press v. NLRB*, 8 Cir. 1973, 486 F.2d 837, *cert. denied sub nom. Bookbinders Local No. 60 v. NLRB*, 1974, 416 U.S. 938, 94 S.Ct. 1939, 40 L.Ed.2d 288; Note, 85 Harv.L.Rev. 680 (1972).

No one can question the majority's statement that the protection of these basic policies must be distinguished from attempts to balance the economic strengths of parties in collective bargaining. Economic coercion may be used to achieve particular terms and conditions of employment. *International Association of Machinists and Aerospace Workers v. Wisconsin Employment Relations Commission*, 1976, 427 U.S. 132, 143–44, 96 S.Ct. 2548, 49 L.Ed.2d 396. But the coercion may not be directed toward inhibiting the exercise of section 7 rights.

In this case the Court has given employers a lethal new tool to combat future unionization and to avoid the process of collective bargaining. By permitting the employer to imply the existence of a strike without identifying any participant and on, what appears to me, to be a flimsy factual basis, the Court in effect denies workers their livelihoods because they joined a union and engaged in collective bargaining. The message will not be lost on workers or management. When a worker joins a union and attempts to bargain about the terms of his employment, he may now lose his job if at his plant any disruptions of production occur which may be laid at the door of a few malcontents or overreacting union workers. Even though he produces a normal output and puts no economic pressure on the company, management may replace him with impunity; the Court of Appeals will infer that he created the disruptions, because the disruptions coincided with his union's negotiations for a new contract. Conversely, when a company tires of its unionized workforce, it can highlight a few production disruptions during contract negotiations, infer an in-plant strike, and replace its workers with non-unionized employees. As a result, workers will be encouraged to avoid unionization and the process of collective bargaining. Companies will be encouraged to thwart bargaining and unionization by visiting the sins of the few on the many, causing unemployment on those who seek to exercise their section 7 rights.

By declining to infer the existence of an in-plant strike, the Board refused to countenance damage to these basic policies. The majority justifies its reversal of the Board in part because the Supreme Court has in-

15. 29 U.S.C. § 157 (1970) states:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

structed courts not to rubber stamp "administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute", *quoting NLRB v. Brown,* 1965, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839. In the case before us, however, the majority rather than the Board frustrates congressional policy and in the process ignores overwhelming precedent in support of the Board's decision. I would affirm the holding that no in-plant strike occurred, as a matter of law and fact, and that no worker was sufficiently linked to unprotected conduct to justify his dismissal or replacement.[16]

### III.

Because I would sustain the Board's decision on whether a strike occurred, I must address the more difficult legal question raised by the parties: may an employer who has locked out his nonstriking workers permanently replace them without notification? The Supreme Court declined to reach the question in *American Ship Building Co. v. NLRB,* 1965, 380 U.S. 300, 308, n. 8, 85 S.Ct. 955, 13 L.Ed.2d 855. This Court has never faced the issue.

### A.

The administrative law judge concluded that permanent replacement of locked-out workers amounted to a violation of sections 8(a)(1),[17] 8(a)(3),[18] and 8(a)(5)[19] of the Act. With regard to the 8(a)(1) and 8(a)(3) violations, the administrative law judge held both that the employer's business purpose could not outweigh the damage inflicted by the replacement on worker rights and that *NLRB v. Erie Resistor Corp.,* 1963, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308, required finding the replacement to be a per se violation of the sections. The Board agreed with the administrative law judge that the hiring of permanent replacements without notifying the union "rendered more than a slight adverse effect upon employees' protected rights, as compared with Respondent's legitimate business purpose". Neither the Board's nor the administrative law judge's opinion reveals the basis of the comparison of the employer and employee interests.

The company attacks the order on two levels. First, it argues that permanent replacement of locked-out workers should not constitute a per se violation of the Act. It bases this argument on *NLRB v. Mackay*

**16.** The company also submits that the workers began a regular strike at the same time as the lockout. The members of the unit approved a strike and received authorization for it from the International. But this is a common negotiating technique and does not justify the inference that a strike actually occurred. The company also relies on a statement made by the International representative to company officials:

> [Y]ou let us go before and we will go again . . . We can hold out to any amount of pressure you can give us . . . .. [W]e will not settle for any less than the other plants.

Because this statement refers to the lockout that had just ended and responds to the company's announcement on October 31 of another lockout, the sentences logically refer to the union's ability to withstand a lockout, not to the imminence of a strike. "Holding out" to company pressure in this context means refusing to capitulate to the company's contract demands despite the economic pressure. Finally, the receipt of union benefits would show a strike only if strikers alone could receive the benefits. The company offered no evidence to prove that locked-out workers could not re-

ceive such benefits. In short, the record does not support the assertion that the employees mounted an economic strike.

**17.** 29 U.S.C. § 158(a) states in part:

> It shall be an unfair labor practice for an employer—
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 . . . ..

**18.** 29 U.S.C. § 158(a) states in part:

> It shall be an unfair labor practice for an employer—
>
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ..

**19.** 29 U.S.C. § 158(a) states in part:

> It shall be an unfair labor practice for an employer—
>
> (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a).

*Radio & Telephone Co.*, 1938, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381, which held that an employer may continue to operate his business during a strike with permanent replacements. The employer also contends that the replacement of these workers did not inherently destroy their rights because they retained certain privileges guaranteed by the Supreme Court.[20] Second, the company justifies the replacement of these workers by balancing its business interests against the rights and interests of the employees. On the company's side of the scales, Johns-Manville places the interest in the survival of the plant as a profitable component of the enterprise. Because of the lockout, the company lost money and faced a loss of permanent customers. The temporary replacements employed immediately after the lockout began had not performed satisfactorily. The management felt that it could not have reactivated the locked-out workers without a contract because of the production disruptions that had occurred five and a half months previously. It also desired to maintain its bargaining position. To avoid further losses without capitulating to the union, then, it argues that its only alternative was to employ the permanent replacements. On the workers' side of the scale, the company places the right to continue the bargaining unit and the right to bargain through that unit. Af-

ter asserting that it did not intentionally damage these two rights, the company says that detriment by permanent replacement after the lockout was no greater than damage by replacement after the strike in *Mackay.*

### B.

I respond to these arguments by analyzing the interests of the parties and the motive of the company consistent with the facts found by the administrative law judge.

I would adhere to the guidelines established by *NLRB v. Great Dane Trailers, Inc.*, 1967, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027, for assessing alleged 8(a)(1) and 8(a)(3) violations.[21] *Great Dane* analyzed an alleged infraction of section 8(a)(3) by a company's refusing to pay accrued vacation benefits to strikers while paying the benefits to replacements, nonstrikers, and returning strikers. The Court identified three elements of an 8(a)(3) unfair labor practice: discrimination against workers exercising their rights, resulting discouragement of union membership, and anti-union motivation on the part of the company. Although the Court easily found discrimination and discouragement of membership on the facts of the case, it considered the motive of the company at length. From a series of earlier decisions[22]

**20.** The replaced worker is subject to recall in the event of a vacancy, *Laidlaw Corp.*, 1968, 171 N.L.R.B. 1366, *enforced*, 7 Cir. 1969, 414 F.2d 99, *cert. denied*, 1970, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100. He may vote in any representation election conducted within twelve months after commencement of a strike. *Wahl Clipper Corp.*, 1972, 195 N.L.R.B. 634. The union may continue to bargain unless the company has sufficient evidence to challenge its representative status. *C. H. Guenther & Son, Inc. v. NLRB*, 5 Cir. 1970, 427 F.2d 983, *cert. denied*, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246.

Although these cases provide the replaced worker some protection, they do not lead to the conclusion that his rights and interests have not been damaged. The protections listed above are of only minimal value to the locked-out Johns-Manville workers. First, in the sluggish economy of 1974 few vacancies occurred. Second, because the company permanently replaced the workers five and a half months after

the lockout, the workers' right to vote in representation elections probably extended only six and a half months after the replacement. The company needed only to wait a short time to gain a representation election in which the electorate would have been composed exclusively of replacements. Third, the union's ability to represent the bargaining unit was substantially undermined by the replacement of the entire workforce. In comparison to the rights that a fully employed worker enjoys, then, the rights granted to a locked-out and permanently replaced worker are inferior.

**21.** Because of my resolution of the 8(a)(1) and 8(a)(3) issues, I would not reach the 8(a)(5) question.

**22.** The Court relied on *NLRB v. Brown*, 1965, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839; *American Ship Building Co. v. NLRB*, 1965, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855; and *NLRB v. Erie Resistor Corp.*, 1963, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308.

the Court established several guiding principles for assessing the motive of employers.

First, conduct may be deemed "inherently destructive" of employee rights when the effect on employee interests is so severe that the conduct carries its own indicia of antiunion animus. *Id.* at 33, 87 S.Ct. 1792. Although the Court has never precisely defined "inherently destructive", I would say that the term denotes conduct that thwarts the basic policies of the Act. For example, action that frustrates the process of collective bargaining or the future of unionization at a plant thwarts congressional goals embodied in sections 7 and 8. Such behavior might lead to the finding of an unfair labor practice, depending on the justifications offered by the company for the behavior. On the other hand, conduct merely influencing workers' ability to maintain their bargaining demands does not reach the viability of the process of collective bargaining and should not be labeled "inherently destructive". *American Ship Building Co. v. NLRB*, 1965, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855, Note, 85 Harv. L.Rev. 680, 683 (1972).

When the behavior of the company begins to frustrate the basic policies of the Act and by its nature demonstrates anti-union animus, direct proof of motive is not required. The Board may infer the illegal intent and find an unfair labor practice even if a business justification exists for the company's action. *Id.* at 34, 87 S.Ct. 1792.[23] Whenever the infringement of employee interests is more than "comparatively slight" and the company asserts a business justification, the Board must balance the respective interests in order to draw a correct inference about the real motive of the employer. *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. at 33, 87 S.Ct. 1792; *NLRB v. Brown*, 1965, 380 U.S. 278, 286, 85 S.Ct. 980, 13 L.Ed.2d 839; *NLRB v. Erie Resistor*, 1963, 373 U.S. 221, 228–29, 83 S.Ct. 1139, 10 L.Ed.2d 308.

Second, if the damage to the employee rights is only "comparatively slight" and the company offers a business justification for its conduct, the activity will be considered prima facie lawful. An unfair labor practice may then be found only upon proof of actual anti-union motive. *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. at 34, 87 S.Ct. 1792.

Third, whenever any damage, however slight, occurs to the rights of employees, the burden shifts to the employer to come forward with a legitimate business justification for his conduct. The burden of going forward with this evidence shifts because the employer has greater access to proof about his motives. *Id.* at 34, 87 S.Ct. 1792.

These principles also apply to alleged violations of section 8(a)(1). *See NLRB v. Fleetwood Trailers Co.*, 1967, 389 U.S. 375, 378, 88 S.Ct. 543, 19 L.Ed.2d 614; *Inter-Collegiate Press v. NLRB*, 8 Cir. 1973, 486 F.2d 837, *cert. denied sub nom., Bookbinders Local No. 60 v. NLRB*, 1974, 416 U.S. 938, 94 S.Ct. 1939, 40 L.Ed.2d 288. The basic elements of an 8(a)(1) unfair labor practice therefore are a) employer action that effectively interferes with, restrains, or coerces employees in the exercise of their section 7 rights and b) intent by the employer to interfere with, restrain, or coerce the right of employees to organize.

### C.

Application of these legal principles to the instant facts reveals an unfair labor practice under section 8(a)(1) of the Act. To begin with, Johns-Manville effectively restrained and coerced the employees who attempted to exercise the right to unionize and the right to bargain collectively at the New Orleans plant. The workers lost their jobs and incomes because they bargained until they reached an impasse. The lesson is clear. These workers and their replacements will be less likely to unionize and bargain in the future because they experienced the economic deprivation imposed by

---

**23.** This method of assessing intent developed in *Erie Resistor.* It merely applies the well-established principle that a person intends the natural and probable consequences of his conduct. 373 U.S. at 227, 83 S.Ct. 1139.

the company. Consequently, the first element of an 8(a)(1) unfair labor practice is met.

Restraint or coercion alone is not sufficient, however, to establish a violation of the Act. All economic pressure by employers coerces or restrains workers, and most of it influences the future exercise of section 7 rights by employees. The pressure is illegal only if it results from an improper, anti-union motive. In this case, an analysis of the company's motive justifies the Board's conclusion that an 8(a)(1) violation occurred.

First, *Great Dane* requires resolution of the question whether the coercion and restraint of the worker's rights were more than "comparatively slight". If the effects were only slight, then *Great Dane* would prohibit the inference of an impermissible motive on the facts of this case. If the effects were more than slight, as the administrative law judge and the Board concluded, then the Board would be able to infer the illegal motivation if the company could not justify its conduct on other grounds. I agree with the Board's conclusion, because the company's conduct will have a serious impact on the future of unionization and collective bargaining at the plant, as demonstrated by comparison of these facts with analogous cases. For example, *NLRB v. Erie Resistor Corp.*, 1963, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308, found an unfair labor practice when the company granted twenty years of superseniority to permanent replacements. This action imposed a substantial discrimination on those exercising their rights because it a) affected all pre-strike workers without regard to whether they had engaged in improper conduct or economic warfare against the company, b) imposed an obvious detriment on those exercising their section 7 rights and an obvious benefit on the replacements, c) dealt a crippling blow to the exercise of the section 7 rights in the future, and d) created an unnatural

cleavage in the bargaining unit that would have lasted beyond the duration of the strike. *Id.* at 230, 83 S.Ct. 1139.

Similarly, consider the lockout and permanent replacement of the Johns-Manville production workers. (a) All of the workers were replaced, not just those who allegedly engaged in illegal economic warfare by creating production disruptions. (b) The workers who exercised their section 7 rights by unionizing and bargaining collectively lost their jobs, for a substantial period and certainly beyond the duration of the labor dispute. This was a detriment not imposed on those who did not exercise their section 7 rights; the replacements were given jobs. (c) The replacements crippled the future exercise of worker rights. The bargaining unit was entirely replaced with workers who had not unionized or bargained. The economic devastation to those who did unionize and bargain would have a chilling effect upon the new workers. Furthermore, in a depressed economy few of the new employees left their jobs within a year of the lockout. Few of the locked-out employees were reinstated. Consequently, the chance for the locked-out workers to exercise section 7 rights was remote.[24] (d) To the extent that any of the workers were reinstated, the company created a permanent cleavage in the bargaining unit between those who exercised their section 7 rights and those who helped management crush the exercise of those rights. This cleavage would have inhibited future unionization and collective bargaining in the plant. In short, the effect of Johns-Manville's permanent replacement of the locked-out workers was just as serious as the effect of the company action in *Erie Resistor*. The Board therefore correctly found that worker rights were more than slightly impaired.

This conclusion is buttressed by a comparison of the facts of this case with cases involving company action having only slight impact on worker rights. In *NLRB v.*

---

**24.** *See* note 20 *supra* for a comparison of the rights of a replaced worker with those of a fully employed worker.

*Brown*, 1965, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839, for example, the Court permitted members of a multiemployer bargaining group to lock-out and temporarily replace all of its workers when the workers at only one store launched a strike. The lock-out and temporary replacement of workers had only a slight effect on worker rights. (a) The coercion was only temporary; it did not threaten permanent employment. (b) The action did not harm future unionization, because the effects of the action did not extend beyond the end of the dispute and because the company retained its character as a union shop. (c) The members could have ended the detriment to their interests by agreeing on a new contract that was better than their previous contract. *Id.* at 288, 85 S.Ct. 980.

None of these facts existed in the Johns-Manville dispute. (a) The coercion was not temporary. The threat of permanent loss of employment at the plant was substantial because the workers had to be carried on the hiring list for only six and a half months.[25] (b) The future of unionization and collective bargaining in the plant was placed in substantial doubt. The company hired an entirely new group of workers who realized that they had their jobs only because the company replaced the unionized workforce. (c) The Johns-Manville workers could not have ended the effect of the employer's action by agreeing to the company's terms. Indeed, the workers never had the opportunity to avoid the permanent replacement by modifying their bargaining position; the company replaced them without notification. This is an important factor in assessing the company's motive. If management had notified the union that it would replace the workers unless a settlement could be reached, the motive would logically have been directed toward settle-ment of the dispute. By proceeding without notification the company made clear its motive to rid itself of these unionized workers. Once the replacement occurred, the employees could no longer have ended their economic distress by settling the dispute. They could only have gained access to a hiring waiting list during a sluggish period of the economy. The effect of company action on the rights of these workers therefore does not resemble the effect identified by the Supreme Court in *Brown* as "slight".

In another case in which a court found company action to affect worker rights only slightly, the company also replaced the workers temporarily. The Eighth Circuit analyzed the facts of *Inter-Collegiate Press v. NLRB*, 8 Cir. 1973, 486 F.2d 837, according to *Brown*. After exploring the factors we have referred to, the Court of Appeals added an element further suggesting that the company acted without anti-union animus: *Inter-Collegiate Press* retained the union's security provisions during the dispute. In this case, on the contrary, the company cancelled the security provisions, which not only distinguishes these facts from *Inter-Collegiate Press* but also supports directly the inference that the company acted with anti-union animus.

Comparison of the Johns-Manville facts with the cases in which courts have considered the extent of damage to worker interests and rights supports the Board's decision that the effect on worker interests here was more than comparatively slight. By permanently replacing the entire workforce without notification, Johns-Manville inflicted substantial and longlasting damage on worker interests and rights. Because this destruction is the obvious and natural consequence of the company's conduct, the inference arises that the company intended the effects.[26]

---

**25.** *See* note 20 *supra.*

**26.** The employer contends that the workers' rights were not seriously affected by arguing that the Supreme Court permitted the permanent replacement of striking workers in *Mackay.* The argument is unpersuasive. *Mackay* did not consider the effect of the replacement on the workers' rights; it did not attempt to infer an illegal intent on the part of the employer. The case pre-dates the legal tests established in *Brown, Erie Resistor* and *Great Dane* by more than 20 years. Consequently, it offers little guidance as to whether the Johns-Manville facts demonstrate more than a slight impairment of worker interests.

Second, *Great Dane* requires a two-fold examination of the business justifications asserted by the company to explain its motives. The legitimacy of the proposed justifications must be established. In *NLRB v. Fleetwood Trailer Co.*, 1967, 389 U.S. 375, 379–80, 88 S.Ct. 543, 19 L.Ed.2d 614, for example, the Court rejected consideration of an efficiency justification because the company, as a matter of fact, had instituted no changes in its production process. The legitimate justifications must then be weighed against the damage to worker interests to reveal the real motive of the employer. *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. at 33, 87 S.Ct. 1792.

The primary justification submitted by Johns-Manville is invalid, as a matter of fact. The management says that it hired permanent replacements rather than ending the lock-out because the workers continued to threaten production disruptions. This phantom fear is based on speculation. As emphasized earlier, no proof exists that more than one, two, three or, at most, a handful of disgruntled employees caused disruptions during August through October 1973. These mavericks may have found other employment during the lock-out. The disruptions therefore might have ceased upon reinstatement of workers available in April. Fear of a recurrence of the disruptions of October 22 is also unreasonable. The workers had been laid off for nearly six months, a substantial cooling-off period. The economic hardship imposed during that time might have made a steady pay check and a job more appealing to the employees than the unemployment compensation and convulsive disruption. Furthermore, the workers neared the end of their six-month eligibility for unemployment benefits. The prospect of the loss of that source of income could have provided additional incentive for the workers to return peaceably to work while the negotiations for a new contract continued. But they never received the opportunity to return because the company permanently replaced them. Without notifying the union of the need for the experienced workers or of the prospect for permanent replacement, the company has no legitimate factual basis to declare that sabotage would have recurred with the return of the employees. The more reasonable inference is that production of about 110 tons a day of paper would have resumed.

Two additional justifications asserted by the company do have sufficient legitimacy to enter the balance required by *Great Dane*. First, the company had an interest in maintaining its bargaining posture and in pressuring workers to accept its position. Second, it had an interest in maintaining the profitability of its enterprise by continuing production despite the economic warfare with the union. According to the company, both of these interests could be satisfied in April 1974 only by permanent replacement of the workforce. According to the company, four courses of action were open to the company when the impasse continued in April. It could have continued its lock-out without replacements of any kind, which would not have satisfied the first interest. It could have continued the lock-out with temporary replacements, which also would not have satisfied the first interest.[27] It could have reinstated the locked-out workers and continued bargaining, which would have satisfied the first but not the second interest. Thus, management concluded that only by permanently replacing the workers could the company maintain its profits while continuing to pressure the union to capitulate.

The company omits a fifth course and thereby undermines the asserted innocence of its motives in April 1974. The company could have notified the union that it was contemplating permanent replacement of the workers to reverse the financial losses incurred while using temporary replacements. Notification would have demonstrated a true interest in pressuring the

---

27. Operation of the plant with temporary replacements proved unprofitable. The company lost $300,000 a month in pre-tax profits from October 1973 through March 1974. Because of reduced output from the plant, management had to curtail production at two other installations that relied on the New Orleans paper.

union to accept the company proposal because it would have given the union leadership a chance to avoid the damage that permanent replacement threatened to employee interests. By taking this action, the company could have satisfied both of its legitimate interests more effectively than by using the permanent replacements. Regarding profitability, the previous workforce could have manufactured the paper more efficiently than a new crew that needed training and orientation. Regarding maintenance of the bargaining position, a settlement induced by the notification would have satisfied this concern completely whereas the permanent replacement alternative left the company with an impasse and a new, untested crew of workers that might or might not have performed satisfactorily. If they had not, the company would still have faced the impasse. Management's disregard for the best approach to protect its interests therefore casts doubt on whether these concerns actually motivated company action. In balancing the various effects to reveal the motive of Johns-Manville, this failure diminishes the weight assigned to the two interests asserted by the company.

Finally, *Great Dane* requires a comparison of the asserted business justifications and the damage inflicted on worker rights and interests. On the facts of this case the damage to worker rights dominates the alleged justifications. The damage flows naturally from the permanent replacement of the workers. The inference therefore arises that the company intended the consequences. Johns-Manville could have rebut-

ted this inference by showing that business justifications motivated its conduct and that the damage to worker rights was therefore an unintended effect. The company has not met this burden, however, because it failed to pursue the avenue that would have best protected its profits and supported its bargaining position. Instead, it adopted an approach that provided less protection for its interests and more damage to the worker's rights. I can only conclude that such conduct was motivated by anti-union animus.[28] The company therefore committed an unfair labor practice under section 8(a)(1) of the Act by permanently replacing its locked-out workers without notification.

### D.

The company also violated section 8(a)(3) of the Act. As pointed out in subsection III–B of this opinion, an 8(a)(3) unfair labor practice includes three elements: (a) discrimination with regard to hiring or tenure of employment, (b) encouragement of union membership, and (c) intent to encourage or discourage worker unionization. 388 U.S. at 32–33, 87 S.Ct. 1792. Here, the first element is satisfied because Johns-Manville hired the replacements while failing to reinstate the locked-out workers. This is discrimination with regard to hiring. The analysis of the alleged 8(a)(1) violation demonstrated that the discrimination will discourage union membership.[29] Both the locked-out workers and the permanent replacements will be less likely to unionize at the Johns-Manville plant in the future. The replacements have seen the economic deprivation that results from unionization.

---

**28.** This conclusion is reached without an attempt to balance the economic weapons available to the parties. The company argues at length that the NLRB issued the order in this case only because it found the company's economic warfare to be "too effective". This argument legally misses the point. The balancing mandated by *Erie Resistor* and *Great Dane* is not pursued for its own sake. It is merely a method of determining whether the company acted with an illegal motive. If the company's behavior and the results of that behavior effectively promote the company's bargaining position and do not inhibit the future exercise of

section 7 rights by workers, then an illegal motive cannot be inferred. On the other hand, if the conduct also tends to coerce or restrain the future exercise of those rights, regardless of its "effectiveness" in promoting the bargaining position of the company, the basis for inferring the impermissible motive exists. Here, the destruction of rights is so significant and the company's supposed interests are so ineptly pursued that the company must have intended to thwart future unionization and collective bargaining at its plant.

**29.** *See* subsection III–C *supra*.

The replaced workers have no positions at the plant and will probably not be reinstated in the future. They will therefore have little opportunity to join or to retain union representation for the bargaining unit. The intent element is satisfied by the analysis of the company's intent to violate section 8(a)(1).[30] Thus the violation is established and the Board's order justified.

## IV.

In summary, I would enforce the order of the National Labor Relations Board. As a matter of fact and law, no "in-plant" strike occurred to justify the replacement of the workers. The replacement of them without notification and in the absence of a strike violates sections 8(a)(1) and 8(a)(3) of the Act. Because the majority has approved these violations and permitted serious damage to worker rights and congressional policy, I cannot agree with the decision of the Court.

---

**30.** *Id. Great Dane,* the basis for the preceding intent analysis, held that the employer had committed an unfair labor practice under section 8(a)(3).