**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**SHOP RITE FOODS, INC., Respondent.**

No. 28244.

United States Court of Appeals,
Fifth Circuit.

Aug. 21, 1970.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Elliott Moore & Janet McCaa, Washington, D. C., Elmer P. Davis, Region 16, N. L. R. B., Fort Worth, Tex., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B. for petitioner.

J. A. Gooch, Edward L. Kemble, Cantey, Hanger, Gooch, Cravens & Munn, Fort Worth, Tex., for respondent.

Before GODBOLD, SIMPSON and MORGAN, Circuit Judges.

GODBOLD, Circuit Judge:

 Enforcement of the Board's order is granted insofar as it directs Shop Rite to cease and desist from interrogation, threats of discharge and surveillance.[1]

The remaining issue in the case poses once again the conflict between the right of employees to engage in concerted activities protected by Section 7 of the National Labor Relations Act, 29 U.S.C. § 157,[2] and their duty to present grievances through their duly certified bargaining agent under Section 9(a), 29 U.S.C. § 159(a).[3]

In September, 1966, after a Board election, the United Packinghouse, Food and Allied Workers was certified as the exclusive bargaining representative for an appropriate unit of employees at Shop Rite's warehouse in Lubbock, Texas. There were approximately 130 employees in the unit at the time of the events in question. The union set up a local, and officers were chosen.

In late November negotiations for a collective bargaining agreement began. There were monthly meetings in November, December and January, three meetings in February, and five in March— March 1, 15, 16, 28 and 29. The company made written counterproposals on March 15 and 28, and what it described as its final offer was mailed to the union on March 31. Thus, when the walkout here in issue occurred—on March 31

—the company had made what it termed a final offer, and the next thing to be done was acceptance or rejection by the union.[4]

Beginning in late February and continuing into March, Warehouse Superintendent Belcher and Warehouse Manager Probasco noted a significant increase in the amount of damaged merchandise in the warehouse. They concluded that the damage was being intentionally caused by dissident employees as a pressure tactic to secure concessions from the company in the collective bargaining negotiations. Probasco told employee Hawkland, president of the local, that he regarded the increase in damage as deliberate. He requested Hawkland use his influence to control the damage, and told him damage tactics would not affect the bargaining negotiations. Hawkland, while denying knowledge of unusual damage, agreed to convey the request to union members. The damage, according to management, continued to be excessive. For three days off-duty policemen were hired to stand guard in the warehouse. They were dismissed at Hawkland's request. Excess damage stopped for ten days until March 30, when 29 sacks of dog food were found cut. Wenk, a vice-president of the company, conferred with President Hawkland, Chief Union Steward Lee, and Committeeman Ivey and asked their help so that it would not be necessary to recall the guards.

---

1. Enforcement to that extent is not opposed.

2. "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. * * *"

3. "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided,* That

any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further,* That the bargaining representative has been given opportunity to be present at such adjustment.

4. On April 17 the union rejected the company's March 31 proposal. The Board held that the General Counsel did not sustain a charge of failure to bargain in good faith.

On the morning of March 31, a Friday, Superintendent Belcher observed employee Bownds in the flour section, where he had no business to be, making quick motions with his hands. He went to the place at once and found several bags of flour had been cut, apparently with a sharp instrument. Superintendent Belcher reported to Manager Probasco and Vice-President Wenk that he had seen Bownds cut sacks of flour. Wenk instructed that Bownds be discharged. Bownds was called to the office and told he was being fired for intentionally cutting sacks of flour.[5]

On his way out of the warehouse Bownds told President Hawkland of his discharge. Hawkland and Chief Union Steward Lee went to the flour section and found Manager Probasco and Vice-President Wenk there. Lee stated that "[Bownds] hadn't done this, that we [the company] were asking for trouble." Wenk told Lee that "this wasn't the time to discuss it" and to return to his work or he would be fired.

Approximately half an hour later, during their coffee break, Hawkland, Lee and Ivey, accompanied by about 10 other employees, came into Probasco's office where Wenk was also. One or more of the officers demanded proof of why Bownds was fired. Wenk told them that this was not the time or place to discuss it, that he was not obligated to prove it, and that unless they left the office at once and returned to work he would fire them for insubordination. They threatened to walk out, and Wenk told them if they did so they were quitting.

Hawkland and Ivey solicited and led an immediate walkout of about 30 employees. Eight more joined it later that day or the next morning.

Immediately after the walkout began the participants went to the union hall and told Ramon, the field representative of the international union, what had transpired. He told them he would get in touch with George Thomas, the union's district director at Fort Worth, Texas, to get authorization for the strike and to "go on and picket." Picketing commenced about 11:30 a. m. of that day. Mauser, the field representative of the international union who had been the union negotiator in the bargaining sessions, was in Fort Worth. On Friday, Raman notified him of the walkout. Mauser took no action until Monday. On the morning of that day he told Shop Rite's attorney in Fort Worth in person that the strike was unauthorized. He telephoned Hawkland that the union would not authorize the strike and wired Hawkland that the strike was unauthorized and members were to return to work. He wired the company attorney that the "wildcat strike"[6] had been terminated and the participants ordered back to work.[7]

■ Picketing continued until Monday noon, by which time employer and local union officials and members had been told the strike was unauthorized. Beginning Monday afternoon most of the strikers applied for reinstatement, but none was rehired although the evidence amply establishes that they had not been replaced.[8] Eighteen days after the strike

5. The trial examiner found that the General Counsel failed to prove a charge that Bownds was discharged for engaging in protected activities.

6. Our decision does not turn on the descriptive characterizations given by union personnel to the strike. Therefore, we need not pass on the accuracy of the Board's finding, based on Hawkland's testimony at the hearing, that when he described the strike as "wildcat" he really meant something else than the commonly accepted meaning.

7. Also, on Monday afternoon, Hawkland told Superintendent Belcher that the international union would not authorize the strike.

8. If the unreplaced strikers were engaged in protected activity they were entitled to reinstatement when they unconditionally applied for it. NLRB v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381, 1389, 1390 (1938).

began the international granted a strike authorization to permit the workers to obtain strike benefits.

The Board found that the employees were discharged as of the day they walked out. This finding is supported by substantial evidence, including that of threats of immediate discharge and the immediate termination of insurance benefits. The Board also found that the strike was for two purposes which were inextricably mixed, to protest both the discharge of Bownds and the company's refusal to discuss the discharge with the group which came into Probasco's office.[9]

This leads us to consideration, in the situation where there is a bargaining representative, of the principles governing exercise by employees of Section 7 rights independently of the union.[10]

In NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967), the Supreme Court held that it was not an unfair labor practice under Section 8(b) (1) (A) for a union to impose and judicially enforce fines against union members who crossed a picket line. There, as here, it was argued that the employees were protected by their Section 7 right to engage in concerted activities. The Court found authority for the union's action in the proviso to 8(b) (1) (A), protecting "the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein."

■ On the way to this result, the Court made clear that the national labor policy

extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees.

388 U.S. at 180, 87 S.Ct. at 2006, 18 L.Ed. 2d at 1127. An employee in effect pledges when he joins a union that he will exercise some of his Section 7 rights only in accordance with the majority choice of his union. *Allis-Chalmers* is reinforced by the subsequent decision of Scofield v. NLRB, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969).

■ The extent to which any individual employee's Section 7 rights will be held limited by the needs of his collective bargaining unit has been the subject of case by case development. *Allis-Chalmers* limits those rights at least vis-a-vis the member's union in picketing situations. By the proviso to Section 9(a), the Act indicates a preference for collective as opposed to individual action in negotiating with the employer. That section allows an employee, or group of employees, to adjust grievances with the employer even though a bargaining representative has been chosen (so long as not inconsistent with an agreement in effect), provided the bargaining representative has an opportunity to be present. A major reason for this preference is to protect the ultimate goal of labor adjustment:

Since the employer is required to bargain with the representatives of the worker, it must have some assurance, first, as to the identity of that agent. More important, however, it must be able to deal with that agent as the responsible spokesman for the employees of the unit. There cannot be bargaining in any real sense if the employer has to deal with individuals or splinter groups.

NLRB v. R.C. Can Co., 328 F.2d 974 at 978 (5th Cir. 1964). In *Allis-Chalmers*,

---

9. While not necessary to our decision, we point out that the finding that Wenk refused to discuss the discharge is somewhat misleading by its lack of precision. When the employees came into the office they demanded that Wenk furnish them with proof of the reasons for Bownds' discharge. It was in this context that Wenk stated that this was not the time and place for discussion.

10. Were there no bargaining representative, a strike to protest the discharge of a fellow employee would be protected activity. NLRB v. Solo Cup Co., 237 F.2d 521 (8th Cir. 1956).

as showing that recourse to the union before engaging in concerted activity is both necessary and effective, the Supreme Court noted the need to preserve the union as exclusive bargaining agent, the Landrum-Griffin Act as a means to protect the speech and voting rights of members, and the judicially expanded duty of fair representation.

NLRB v. Draper Corp., 145 F.2d 199 (4th Cir. 1944), relied upon by the respondent, concerned a strike by a minority when the certified union was bargaining for a new contract, to try to force the hand of the company, which the minority considered to be stalling in the negotiations. The union did not call, authorize or sanction the strike. The Fourth Circuit characterized the strike as "wildcat" and held it was not activity protected by Section 7, so that the minority, while having the right to strike, was not protected by the statute from discharge for doing so.

The Board places its principal reliance on NLRB v. R.C. Can Co., *supra*. In that case eight employees of a bargaining unit of fifty walked off the job in protest against the employer's reluctance to come to the bargaining table. In a union meeting just previously held, though there was no formal vote, the consensus was that there should be no strike at that time. However, the union had set the achievement of bargaining as one of its goals and had communicated that goal to the employer. When the union representative learned of the walkout he expressed disappointment but did not repudiate the minority action and instead told the participants that their action was protected activity. The opinion, as quoted above, pointed out the interests of collective bargaining with an identified agent but also discussed the competing interest that within the union as a democratic device the members must not be deprived of freedom to speak effectively "in behalf of their own organization and the aims and objectives which it collectively seeks to assert in their behalf." 328 F.2d at 979. The court then set up this test:

In these conflicting policies, there may be found a basis for resolution: is the action of the individuals or a small group in criticism of, or opposition to, the policies and actions theretofore taken by the organization? Or, to the contrary, is it more nearly in support of the things which the union is trying to accomplish? If it is the former, then such divisive, dissident action is not protected. N.L.R.B. v. Draper Corp., 4 Cir., 1944, 145 F.2d 199, 156 A.L.R. 989; Harnischfeger Corp. v. N.L.R.B., 7 Cir., 1953, 207 F.2d 575; Plasti-Line, Inc. v. N.L.R.B., 6 Cir. 1960, 278 F.2d 482. If, on the other hand, it seeks to generate support for and an acceptance of the demands put forth by the union, it is protected so long, of course, as the means used do not involve a disagreement with, repudiation or criticism of, a policy or decision previously taken by the union such as, for example, a no strike pledge, a cooling off period, or the like during negotiation. Western Contracting Corp. v. N.L.R.B., 10 Cir., 1963, 322 F.2d 893.

*Id.* The court found that what the minority did was not really different from what the union sought and was in support of it.

*R.C. Can* concerned a very narrow set of circumstances in which the minority action was directed toward a specific, previously considered and articulated union objective. If union objectives are characterized in general terms—such as wages, job security, conditions of employment and the like—one can assume that in a great majority of instances minority action will be consistent with one or more of those objectives. If *R.C. Can* is not applied with great care it would allow minority action in a broad range of situations and permit unrestrained undercutting of collective bargaining.

Subsequently this circuit, without referring to *R.C. Can*, and relying on *Draper*, held that an employee may be discharged for participating in a minority strike. NLRB v. Cactus Petroleum, Inc., 355 F.2d 755, 761 (5th Cir. 1966). See

also Southern Conference of Teamsters v. Red Ball Motor Freight, Inc., 374 F.2d 932, 937 (5th Cir. 1967). In NLRB v. Tanner Motor Livery Ltd., 419 F.2d 216 (9th Cir. 1969), the Ninth Circuit rejected the rationale of *R.C. Can* in favor of *Draper,* which it viewed as "more in accord with a concept of orderly bargaining premised upon democratic union processes." 419 F.2d at 221. However, *Tanner* circumscribed the plenary sweep of the *Draper* language by holding that the minority employees had an obligation to present to the union the objective which they sought (non-discriminatory hiring practices) before undertaking to achieve the objective of dealing with the employer themselves. The Ninth Circuit pretermitted as premature the resolution of whether if a majority of the union decided not to press the objective urged by the minority, the minority could deal directly with the employer concerning it.

█ We conclude that *R.C. Can* is of doubtful viability, and, in any event, its restricted factual framework does not reach the instant case. The challenge of Bownds' discharge was not an established union objective. The union had been given no opportunity even to consider whether it should be an objective, and, if an objective but not achieved, whether a strike would be employed as a weapon. To the contrary, the minority group, acting outside the channels of union affairs, took action first to protest, then to enlist what support they could for a walkout, and after the event notified the bargaining representative of the walkout and sought approval. When the bargaining representative acted it disapproved and ordered the men back to work.[11] The failure of the group which entered Probasco's office to notify their bargaining representative that they desired to contest Bownds' discharge could only undermine the goals of democracy in the unions and effective labor adjustment through the bargaining process.

We do not consider it determinative that a collective bargaining agreement was not in effect. Relations between employer and collective bargaining agent are especially sensitive when negotiations for a contract are in progress, and here the walkout occurred when a newly certified union was bargaining for an initial contract, at the very time that the company was making its final offer for union acceptance or rejection.[12]

We do not hold that there cannot be circumstances in which an employee or a minority group of employees may engage, without reference of the matter to union processes, in action which is protected under Section 7 though there is an agreement in force or in the process of negotiation. But this is not such a case.

Enforcement is granted in part, denied in part.

11. These facts cannot be brought within the ambit of *R. C. Can* by the Board's finding that the strike had the explicit and implicit approval of the union. This finding is based on Ramon's statement of Friday that he would get in touch with the district director at Fort Worth to get authorization, and "to go on and picket," Ramon's notice to Mauser on Friday of the walkout, and Mauser's inaction until Monday at which time he notified all concerned that the strike was unauthorized and ordered the men back to work. It was not shown that Ramon was empowered to authorize a strike, but, to the contrary, he made clear that he had to seek authority elsewhere. The foregoing is not substantial evidence that the union either implicitly or explicitly approved of the walkout but proves precisely the contrary, that union approval was sought and, when the matter was considered, was promptly denied. Unions need not always act by Roberts Rules of Order, but informality and necessity for expedition cannot make approval out of a denied request for approval.

12. See NLRB v. Sunbeam Lighting Co., 318 F.2d 661 (7th Cir. 1963).