**RICHARDSON PAINT COMPANY, INC.,
Petitioner, Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent,
Cross-Petitioner.**

**No. 76–4314.**

United States Court of Appeals,
Fifth Circuit.

June 12, 1978.

Randolph P. Tower, Theo. F. Weiss, San Antonio, Tex., for petitioner, cross-respondent.

Elliott Moore, Deputy Assoc., Gen. Counsel, Michael S. Winer, Supervisor, Ruth E. Peters, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, N.L.R.B., Washington, D. C., for respondent, cross-petitioner.

Before THORNBERRY, GOLDBERG, and CLARK, Circuit Judges.

GOLDBERG, Circuit Judge:

This case is before the court on a petition to review and set aside an order of the National Labor Relations Board and on cross application by the Board seeking enforcement of its order. In the proceedings below, the Administrative Law Judge (ALJ) found that the petitioner, Richardson Paint Company, Inc. ("Richardson" or "the Company") violated Section 8(a)(1) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 151 et seq., by laying off three employees, Bass, Bryant and Bowling, who had engaged in protected concerted activity, and by discharging one employee, Tipton, for similarly unlawful reasons. The ALJ further held that certain threats by Richardson's management interfered with and coerced employees in the exercise of their protected rights. The National Labor Relations Board, one member dissenting, agreed with the ALJ's ultimate conclusion that the layoff of three employees was in violation of Section 8(a)(1), but reached its

conclusion based on a somewhat different rationale and on different evidence. The Board unanimously agreed with the findings and the conclusions of the ALJ with respect to the discharged employee.

Recognizing the deferential standard of review appropriate to review of NLRB findings, we nevertheless feel compelled to agree with the petitioner and dissenting Member Walther that the General Counsel failed to prove that the layoff of Bass, Bryant, and Bowling was in violation of the Act. We therefore set aside and decline to enforce the Board's order with respect to that layoff. We do, however, find substantial evidence in the record to support the unanimous conclusion of the ALJ and all three members of the Board that Richardson's discharge of Tipton constituted an unfair labor practice under Section 8(a)(1) and accordingly enforce that portion of the Board's order.

## I. FACTS

Richardson Paint Company, Inc. is a Wisconsin corporation with its principal office located in Austin, Texas. The Company specializes in industrial painting for public utilities, including both existing facilities and new construction. Richardson's workforce consists of two types of employees, "permanent," or "cadre" painters, who are highly skilled in painting energized electrical equipment and are moved by the Company from job site to job site, and "temporary" painters, generally less skilled, who are recruited from the locale for a particular project and are employed only for the duration of that project. The Company is a "union" company; its "permanent" painters are covered by a national contract with the International Brotherhood of Painters and Allied Trades, while "temporary" painters are covered by local contracts with union locals.

Richardson contracted to paint a large steam electric power station under construction near Monticello, Texas, and began work on this job site in February of 1972. The Company signed a contract with the Union at the inception of the Monticello

job, and all non-supervisory personnel at the site were provided by Local 459 of the Union.

Employment requirements at the Monticello site varied, depending on the amount of construction work completed by other contractors at the job site and on the suitability of climatic conditions for outdoor painting. The project experienced a number of significant layoffs from its inception in 1972, including layoffs in the autumns of 1972 and 1974. As of July, 1975, Richardson employed three crews of painters totalling some thirty workers at Monticello. At that time, Richardson's operating superintendent, J. D. Johnson, spoke to Lem Watson, the Company's on-site job superintendent, and Jack Leath, another on-site superintendent, about the need for another layoff. Watson and Leath responded that they wanted to get more of the outside work completed prior to the onset of anticipated bad weather. A layoff of six employees did, however, take place on October 8, 1975. That layoff and associated events are the subject of the NLRB charge in this case. Subsequent to those events, a further layoff occurred in January of 1976, after the NLRB charge was filed, and an additional layoff was imminent at the time of the NLRB hearing.[1]

The steps leading to the disputed layoff originated early in the construction period. The Monticello facility consists of three large units, each with its own steam turbine. During the final construction stage for each unit, the steam turbine goes through a "blowdown" phase which lasts 2–3 weeks. The purpose of the blowdown is to remove the residue material and impurities which get into the turbine during construction of the unit. This blowdown procedure is accompanied by a great deal of noise. Although other employers at the Monticello site furnished ear protection to their employees for use during the blowdowns, Richardson did not.

When the blowdown for the first power station unit occurred in 1974, employees on the crew supervised by Foreman Buddy Pate complained to their Union job steward, Bill J. Bass, about the lack of ear protection. Bass approached Lem Watson, the Company's job superintendent at the Monticello site, who responded that the collective bargaining agreement between the Company and the Union did not require the Company to furnish ear protection to its employees. When the blowdown for the second unit occurred in July, 1975, crew members again approached Bass and also Foreman Pate about the need for ear protection. Watson, when contacted, again responded that the Company was not required to furnish ear protection.

In September, 1975, the Company issued numbered identification buttons to be worn by its employees. Pate picked up the buttons for his crew at the Company's on-site office on the morning of September 15. At a meeting with his crew later that morning, Pate told his men that they were required to accept and wear the buttons. The crew members had previously told Pate that since the Company would not furnish ear protection because it was not provided for in the contract, they would not wear the buttons because the buttons were not provided for in the contract. None of the crew members accepted the buttons from Pate. Pate and Bass then went to see Watson. Bass told Watson that the crew members did not feel obligated to wear the identification buttons because of the Company's failure to provide ear protection. Watson became upset and said that the employees had to wear the buttons. Bass and Watson then telephoned Jack Dudley, the Union business agent, who said that he would be there the next morning to straighten the matter out. Bass and Pate then went back to work.

Pate had lunch on September 15 with the foremen of the other two painting crews and other Company supervisors. During

---

1. The post-October 8 layoffs give rise to no unfair labor practice charges in the instant proceeding.

lunch, Watson informed Company Operating Superintendent J. D. Johnson that Pate's crew refused to wear the identification buttons. Johnson told Pate to inform the men that they either had to wear the buttons or "hit the gate." After lunch, Pate called his crew together and related Johnson's ultimatum. The crew members again said that they were not going to wear the buttons; shortly thereafter, however, two members of the crew accepted buttons from Pate and went back to work. The other crew members and Pate walked off the job, in violation of the no-strike provision of the collective bargaining agreement between the Company and the Union.

Union International Representative Herby Beard, Business Agent Dudley, and Johnson met on the evening of September 16 and worked out an agreement, the terms of which provided that the employees who had walked out would be allowed to return to work. Pate's crew members would be expected to wear the identification buttons and not to discuss the incident with other employees. In return, the Company agreed to furnish ear protection, and Johnson assured Beard that the Company would not retaliate against the employees who had participated in the walkout. Watson did not want to take Pate's crew members back on the job, but Johnson ordered him to do so. The crew members returned to work on September 17. Also at that time, Bill Bass was replaced as Union steward by Paul Steward, a member of Pate's crew who had not participated in the September 15 walkout.[2]

Work went as usual for Pate's crew until October 8, 1975, when three members of the crew—Bass, Jack Bowling and Danny Bryant—were laid off, along with three employees from the other two painting crews, who were not involved in the September 15 walkout. Watson decided which employees were to be laid off and when—in terms of a particular date—the layoff was to take place.

On the morning of October 9, the day after the layoff, Bass met Keith Tipton at the site and gave him a petition protesting the layoff. Tipton, a member of Pate's crew, had been absent from work on September 15 and did not participate in the walkout. Tipton obtained some signatures on the petition during the morning break, and left his work area to circulate the petition among members of the other crews during the noon lunch period. Tipton again circulated the petition during the afternoon workbreak. Later that afternoon, Pate took Tipton to the office, where Watson, Leath and the other crew foremen were already gathered. Watson told Tipton, "Boy, I hear you've got a petition going around here trying to get names on it for Bill Bass. Let me see it and I might sign it." Tipton replied that he had destroyed the petition, although he actually still had the petition in his possession. Watson said that he did not need instigators on his crew and that Tipton was fired. Watson also instructed Pate to tell his crew that anyone else who was planning to instigate trouble on the job, as Tipton had done, would also be fired.[3] After some further discussion, Watson gave Tipton his check and Tipton left. A minute or two later, Tipton returned, gave his check to Pate, and asked Pate to ask Watson to give a reason for the discharge. Watson told the timekeeper to type out a statement saying that Tipton had been fired for "instigation among the crew." Pate gave Tipton the typed statement, and Tipton then gathered up his clothes and left. Tipton later returned the petition to Bass.

A few weeks after these events, on October 23, the Company transferred one of its permanent or "cadre" painters from the River Crest project 20 miles from Monticello to the Monticello job site. Another cadre employee was so transferred on October 27 and two more on November 11. The River Crest project from which all four perma-

---

**2.** The record does not indicate why Bass was replaced or why Steward, apart from the appropriateness of his name, was selected as the replacement.

**3.** This threat was later relayed to the crew members.

nent employees were reassigned was then winding down and was ultimately completed. Watson and Jack Leath, who had supervisory authority over both the River Crest and Monticello projects, made the decision to transfer the four permanent employees to Monticello. Some two months later, three temporary employees were laid off at the Monticello site; a further layoff was said to be imminent at the time the NLRB hearing was held.

## II. *PRIOR PROCEEDINGS*

The hearing before an NLRB administrative law judge was held on February 17, 1976. The ALJ found that the employees on Buddy Pate's crew, in walking off their jobs on September 15, engaged in protected concerted activity under Section 7 of the Act, 29 U.S.C. § 157,[4] and that "the precipitating cause of the layoff in October 1975 was because the employees had engaged in the September 15 activity." The ALJ did not conclude, however, that the particular activities of employees Bass, Bryant, and Bowling in the walkout were the basis for their selection for layoff:

> That is, once determining to lay off employees, it seems as reasonable to have picked the three from Pate's crew that Watson picked as to pick any other three. With the possible exception of Bass, they do not stand out in their participation or as leaders. And from their testimony, as well as my observation of the demeanor of each, the Company would seem justified in its selection.

In finding retaliatory motivation for the layoff itself, the ALJ relied in part on testimony that Company Operating Superintendent Johnson, on the night of September 16 (prior to the agreement worked out between Johnson and the Union), said he was going to get "the instigators." The ALJ rejected the Company's business reason justification for the October 8 layoff, finding there is no evidence

that as of October 8, 1975, there was a business reason to lay off six of thirty employees. There is no evidence of a reduced amount of work required to be done. And of particular significance, within 3 weeks after the layoff, the Company transferred four employees from other projects to the Monticello project.

With respect to the Company's proffered explanation that these four were permanent employees whom the company had to make room for in order to keep them employed, the ALJ stated that "there were seven or eight other projects to which they could have been transferred." The ALJ did "not believe the Company's manpower requirements fluctuated so much in such a short time. . . . [T]he timing of the layoff, the total lack of credible evidence of business reasons for it at that time, plus the fact that four employees were brought in from another project, leads me to the inescapable conclusion that the layoff itself was motivated by a determination on the part of the company agents to retaliate against employees for having engaged in the September 15 activity."

With respect to the discharge of Tipton, the ALJ found that there was "no real evidence," other than Watson's discredited testimony, of a rule prohibiting employees from leaving their work areas during the noon break. The ALJ further found that violation of this alleged rule was not the reason why Tipton was discharged. "He was discharged for passing around the petition, not on company hours but on break time. There appears to be no rule prohibiting this . . . .." The ALJ specifically noted Watson's admission that he fired Tipton principally because Tipton had passed around a petition which Watson referred to as "instigation among the crews."

The ALJ held that "pass[ing] out a petition deploring working conditions, which implicitly seeks to improve them is clearly protected, concerted activity . . . [T]o

---

4. "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

be discharged for engaging in such activity is clearly violative of section 8(a)(1) of the Act." In so holding, the ALJ explicitly considered the Company's contention that Tipton's act was an effort by a dissident group of employees to undermine the Union and the collective bargaining agreement. The ALJ noted that such activity might vitiate the otherwise protected nature of the acts, but found that in the case before him,

> there is no real evidence to support such a conclusion. While the Union's agents do not seem to have been particularly rigorous in their support of the men, nevertheless I find nothing in passing out the petition by Tipton which would undermine the Union's status as the bargaining representative, or be so serious a threat to stable relations to cause Tipton's act to lose its protected character.

Concluding that the Company had engaged in unfair labor practices as alleged by laying off Bass, Bryant and Bowling on October 8th, by discharging Tipton on October 9th, and by threatening other employees, all in violation of Section 8(a)(1) of the Act, the ALJ in his remedial order directed Richardson to cease and desist from certain activities and to take specified affirmative action, including reinstatement of the four employees, necessary to effectuate the policies of the Act.

Both the Company and the General Counsel took exceptions to the findings of the ALJ. The case came before a three member panel of the National Labor Relations Board. The Board, Member Walther dissenting, affirmed the rulings, findings, and conclusions of the ALJ with certain key modifications. In particular, with respect to the layoff of employees Bass, Bryant and Bowling, the Board concluded that the ALJ had misconstrued the General Counsel's theory of the case. The Board found, in contrast to the ALJ, that the September 15 walkout "was not protected because there existed a valid no-strike clause in the collective-bargaining agreement between the [Company] and the Union." The Board went on to find, however, that the Compa-

ny and the Union settled the dispute on September 16, 1975. That agreement specifically provided that there would be no reprisals for the walkout. The Board concluded "inasmuch as the [Company] had thus condoned the concerted activity, the walkout, in effect, became protected and any reprisals for it would violate the Act."

Applying this condonation theory, the Board concluded that the layoff of employees Bass, Bryant, and Bowling was in retaliation for the walkout. The Board specifically noted that while agreeing with the ALJ's ultimate conclusion, it did "not rely entirely on the same evidence." The Board disavowed any reliance on the "instigators" statement allegedly made by Johnson prior to the September 16 settlement, which "did not necessarily remain operative after the settlement." In finding evidence of retaliation, the Board relied heavily on its determination that Watson, rather than Johnson, was responsible for the layoff of October 8. The majority of the Board essentially read Johnson out of any participation in the decision to lay off employees. The Board also, like the ALJ, rejected the Company's contention that the layoffs were justified by legitimate business reasons and discounted the Company's explanation that the relocation of four permanent employees from a project only twenty miles away was economically sound. Instead, the Board concluded that "the transfer of the four regular employees to the Monticello job site clearly warrants an inference that there was substantial work available at Monticello and that the transfer was not merely to avoid forcing regular employees to travel a long distance to relocate." The Board agreed with the ALJ's conclusion that the Company "did not persuasively demonstrate that economic reasons justified its layoff."

With respect to the discharge of Tipton, the Board unanimously agreed with the ALJ's finding that Tipton's activity was "clearly protected concerted activity." The Board found that the Company's reference to Tipton's violation of an alleged rule prohibiting employees from leaving their work area at lunch time "was merely a pretext,"

and agreed with the ALJ that the real reason for Tipton's discharge was his participation in a protected concerted activity. The Board issued a remedial order slightly modifying the order promulgated by the ALJ, requiring the Company to cease and desist from the specific unfair labor practices at issue and from "in any other manner interfering with, restraining or coercing employees in the exercise of" their statutory rights. Affirmatively, the Board's order requires the Company to offer employees Bass, Bryant, Bowling and Tipton reinstatement, and to post appropriate notices.

Member Walther dissented in part from the decision of the Board majority. Walther argued that the General Counsel had failed to prove that the Company laid off employees Bass, Bryant, and Bowling for having engaged in concerted activities in violation of Section 8(a)(1). Walther did, however, agree with the majority and with the ALJ that the Company discharged Tipton in violation of Section 8(a)(1).

## III. *STANDARD OF REVIEW*

■ The appropriate standard of review in this type of case is clear. We are to sustain the Board's determinations if they are supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). It is not our function to overturn the Board's choice between two equally plausible inferences from the facts if the choice is reasonable, even though we might reach a contrary result if deciding the case *de novo. NLRB v. United Insurance Company,* 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968). However, even though our scope of review is limited, we should deny enforcement if, after a full review of the record, we are unable conscientiously to conclude that the evidence supporting the Board's determination is substantial. *Universal Camera, supra; Mueller Brass Company v. NLRB,* 544 F.2d 815 (5th Cir. 1977). In this respect, we must recall that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."

*Id.* at 817 n. 2, *quoting Universal Camera, supra,* 340 U.S. at 488, 71 S.Ct. 456.

## IV. *THE UNFAIR LABOR PRACTICE CHARGES*

### A. *Layoffs of Bass, Bryant, and Bowling*

Applying the applicable standard to the instant case, we are persuaded by our careful study of the record that certain of the Board's conclusions relating to the layoff of Bass, Bryant and Bowling are not supported by substantial evidence. We therefore must set aside those portions of the Board's decision resting on unsupported findings and inferences.

While proceeding under a different standard, our analysis is in substantial accord with the dissent of Member Walther. We note initially, as did Member Walther, that the majority of the Board, in agreeing with the ultimate conclusions of the ALJ, in fact repudiated much of the basis, both legal and factual, on which the ALJ found that the layoff of employees Bass, Bryant and Bowling was unlawful.

■ We do find substantial evidence on the record considered as a whole to support several findings and conclusions of the Board. In particular, we find substantial evidence to support the Board's theory of condonation as applied to this case. While the walkout of Pate's crew was unprotected as conduct in violation of a no-strike clause, the September 16 agreement between the Company and the Union condoned the employees' activity. Under the doctrine of condonation, the employer may not then assert the unlawful aspect of the employees' actions as grounds for subsequent discharge or discipline. *Jones & McKnight, Inc. v. NLRB,* 445 F.2d 97, 102 (7th Cir. 1971). "The doctrine prohibits an employer from misleadingly agreeing to return its employees to work and then taking disciplinary action for something apparently forgiven." *Id.* at 103, *quoting Packers Hide Association Inc. v. NLRB,* 360 F.2d 59, 62 (8th Cir. 1966). With the employer's voluntary forgiveness of the unprotected aspect of the employees' concerted activity, this

activity assumes a protected status. Of course, an employer's discharge or discipline of employees for engaging in protected concerted activity violates Section 8(a)(1) of the Act. *See NLRB v. Washington Aluminum, Inc.,* 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962).

We believe it is clear on the facts of this case that the Company forgave the unprotected aspect of the activity of the employees who breached the no-strike provisions of the collective bargaining agreement by walking off the job on September 15. The Company allowed these employees to come back to work and promised that there would be no reprisals. Thus, under the doctrine of condonation, the walkout assumed protected status, and any reprisal would be illegal.

On October 8 the Company laid off three members of the painting crew who had participated in the walkout, along with three other employees. The ALJ and the Board have determined, and that determination is supported by substantial evidence, that the selection of employees to be laid off was not in itself retaliatory. Thus, the narrow question before us is whether there is substantial evidence to support the Board's conclusion that the October 8 layoff was *itself* a retaliatory action, not justified by legitimate business reasons, and therefore in violation of the Act. After careful examination of the record, we do not believe the Board's conclusion can be sustained.

The bases for the ALJ's and Board majority's findings of retaliatory or discriminatory intent are carefully analyzed in Member Walther's dissenting opinion. That opinion notes that

the Administrative Law Judge found discriminatory intent in making the October 8 layoffs in Johnson's "instigators" statement. The majority quite properly rejects this and instead improperly, in my opinion, finds the necessary unlawful intent in his subordinate Watson's admitted opposition to the September 16 settlement. However, in so doing the majority has relied on only part of Watson's testimony and has completely ignored relevant testimony of Union Representative Beard who negotiated the settlement of the walkout with Johnson.

We agree. With regard to his instructions from Johnson following the September 16 settlement, Watson testified as follows:

Q. Did Mr. Johnson instruct you as to how you were to deal with these employees who had been engaged in this walkout? How you were to treat them?

A. Yes, sir, he was a little firm with me on this.

Q. What did he say?

A. Well, I didn't pull no bones at this particular time about—I didn't want the crew back. I had talked to the crew—I missed this point. I had actually begged this crew to stay with me. I had commended them at this time for the work they had done for me * * * Mr. Johnson took firm steps with me.

Q. What did he say to you?

A. He told me that I would take the crew back, and he told me that I would not harass them. He told me that I would not take any steps to retaliate them which I didn't.

Q. Are you in a habit of listening when Mr. Johnson tells you to do something?

A. If I don't, I won't have my job long.

Q. All right.
Did you listen to him and do what he said to do in this case?

A. Yes sir, I never discussed this problem with this crew.

We need not credit Watson's assertion that he in fact took no retaliatory action to conclude that he was instructed not to do so by Johnson, his superior. This conclusion is reinforced by the testimony of Union Representative Beard. Called as a witness by the General Counsel, Beard stated that his Union's relationship with the Company was good, that he had had dealings with Johnson in the past, that Johnson was an honor-

able person, and that he believed Johnson's promise that men who had walked out would not be harassed.

The majority of the Board argued that Beard's testimony concerning the Union's good relationship with Johnson was of little relevance "inasmuch as Johnson had very little input into the decision to lay off employees." The majority also stated that Watson, rather than Johnson, decided that a layoff should be made and that "Johnson's lack of participation in the final decision to have a layoff indicates that he was not in a position to insure enforcement of his pledge not to retaliate against those who had walked out." We must agree with Member Walther's observation that "[t]hese statements as to Johnson's participation in the layoff decision are based on a misreading of the evidence." Johnson's testimony, neither contradicted on the record nor discredited by the ALJ, was as follows:

Q. Did you have any part in the number of people to be laid off?

A. I did.

Q. When had that been discussed, and what number had been discussed?

A. We had discussed this previously. Jack Leith, Lem Watson, and myself decided this. They had discussed among themselves, and we had discussed it together. Lem and I discussed it by ourselves. We felt we could cut six people.

Q. And were these discussions before or after September 15 when this walkout occurred?

A. Prior to.

■ The standard of review requires that the substantiality of evidence be considered on the record taken as a whole. We believe that the evidence relied on by Member Walther and not discredited by the ALJ cannot be ignored.[5] While it is not our task to reweigh the evidence—and we do not do

so—in assessing the substantiality of evidence supporting the findings below, we "must take into account whatever in the record fairly detracts from its weight." *Mueller Brass Co. v. NLRB, supra,* 544 F.2d at 817 n. 2, *quoting Universal Camera, supra.* The evidence in the record requires the conclusion that it was Johnson and not Watson who made policy for the Company, including the policy decision that a layoff of six employees take place, and that Watson complied with Johnson's orders. Johnson had promised the Union that there would be no harassment of the employees who had walked out on September 15. Of the six employees selected for layoff on October 8, only three had participated in the September 15 walkout, and no more than one of these three had any prominence in the events accompanying the walkout. The ALJ found that if the layoff itself was motivated by lawful reasons, the selection of the particular individuals to be laid off was justified. Thus, Watson followed Johnson's instructions in this respect.

In rejecting the Company's explanation for the October 8 layoff, the majority members, like the Administrative Law Judge, ignored relevant evidence which supports the Company's position that the layoffs were not motivated by an intent to retaliate against participants in the September 15 walkout. Johnson testified that employment at the Monticello project had fluctuated, that there were several occasions, including two of the previous three autumns, when employees were laid off as work slackened, that he had discussed layoffs with Watson before October 8, and that he and Watson had decided that six men should be laid off with Watson to select the individuals to be laid off. Johnson also testified, as did Watson, both without contradiction, that at the September 16 meeting with Beard to settle the walkout of the

---

5. *See NLRB v. Huntington Hospital, Inc.,* 550 F.2d 921 (4th Cir. 1977):

[W]here material uncontradicted evidence has been ignored, . . . or where the evidence has been disregarded or eliminated by the casual expedient of discrediting an employer's witnesses, . . . the result is

that the Trial Examiner's report and the Board's findings will not be accorded the presumption of correctness usually attributed to the trier of fact.

*Id.* at 924, *quoting NLRB v. United Brass Works, Inc.,* 287 F.2d 689, 691 (4th Cir. 1961).

previous day, Johnson told Beard that there was going to be a layoff because the job was winding down. In light of this evidence, the conclusion below that the layoff was retaliatory and was not justified by economic reasons cannot stand.

■ We find nothing in the transfer of four permanent employees from another project, located some twenty miles from Monticello, to the Monticello project, which contradicts the conclusion that legitimate business reasons justified the layoff of the six temporary employees. It is simply not in the Board's province to require that a company transfer its permanent employees to more distant projects rather than to a project within commuting distance of where they had been working. The Company had a management responsibility to keep its permanent personnel employed at some site even if there is not enough work anticipated at the site to require the retention or calling back of the temporary personnel who were laid off. The Board's observation that "it was not unusual to transfer [permanent] employees to jobsites distant from where they had been working" and its apparent suggestion that the Company could and should have transferred these employees to more distant jobsites constitute the "over-the-shoulder supervision" of management by the Board so frequently rejected by this court. *NLRB v. McGahey*, 233 F.2d 406, 413 (5th Cir. 1956); *Mueller Brass, supra*, 544 F.2d at 819; *Florida Steel Corp. v. NLRB*, 529 F.2d 1225, 1234 (5th Cir. 1976). The permanent employees were transferred to Monticello in stages, on October 23, 27, and on November 11, as the River Crest project wound down. These were the only additional painters placed on the Monticello payroll after the October 8 layoff; three other painters, all temporary employees, were laid off in January 1976 and another layoff was imminent in February. We believe this recital of the facts of hiring and layoffs, far from supporting the majority's inference "that there was substantial work available at Monticello," makes clear there was less work after October 8 than there was before and that this reduction in work load justified a layoff of some temporary employees.

We do not believe that the Board could properly base its conclusion that the layoffs of October 8 were retaliatory on this reassignment of cadre employees. Nor could such a conclusion be based on statements made by Johnson prior to the condonation on September 16. Finally, we cannot accept, on the basis of the record before us, the Board's conclusion that Watson rather than Johnson was responsible for the policy decision to lay off some six employees in the fall of 1975. Accordingly, we must set aside and decline to enforce the Board's order with respect to the layoff of Bass, Bryant and Bowling.

### B. *Discharge of Tipton*

■ We believe the Board is on firmer ground in its conclusion with respect to the discharge of employee Tipton on October 9. The ALJ found no concrete evidence that a rule had been promulgated prohibiting employees from leaving the work area on the lunch break. There is specific testimony that Foreman Pate had never been informed of such policy, and had never brought the existence of such a policy to the attention of Tipton or other crew members. We also find ample evidence in the record to support the conclusion that the Company's reference to Tipton's violation of this alleged rule was merely a pretext, and that the real reason for Tipton's discharge was his circulation of a petition protesting the October 8 layoff. While there is some evidence that might support a contrary conclusion, we also find substantial evidence in the record considered as a whole to support the ALJ's conclusion, affirmed by the Board, that nothing in Tipton's circulation of the petition "would undermine the Union's status as the bargaining representative, or be so serious a threat to stable relations to cause Tipton's act to lose its protected character." This finding is in marked contrast to the corresponding finding in *Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975), a case heavily relied on by the Company. In that

case, "the Trial Examiner and the Board found that the employees were discharged for attempting to bargain with the Company over the terms and conditions of employment as they affected racial minorities." *Id.* at 60, 95 S.Ct. at 984.[6]

The activities of the discharged employees in *Emporium Capwell* were of a far different character than Tipton's in this case. The Emporium Capwell employees, specifically informed by the Union and the California Fair Employment Practices Committee of the availability of a contractual grievance procedure and advised to follow it, refused to participate in the grievance procedure; read a statement objecting to reliance on that procedure; walked out of a hearing; held a press conference at which they denounced the store's employment policy as racist; picketed the store and distributed handbills urging customers not to patronize the store; rebuffed the repeated urging of a union official that they rely on the grievance process and instead pressed their demand to deal directly with the Company president; and, after written warnings that a repetition of the picketing or public statements about the Company could lead to their discharge, repeated that conduct the following week. *Id.* at 54–56, 95 S.Ct. at 981–82. In contrast, Tipton merely circulated a petition during his lunch and work breaks concerning the layoff of fellow members of his work crew. We, like the Supreme Court in *Emporium Capwell*, believe "it is important to have firmly in mind the character of the underlying conduct," *id.* at 60, 95 S.Ct. at 984, to which we apply the principles of labor policy.

■ Peaceful circulation of a petition for presentation to an employer for redress of employee grievances is a protected concerted activity. *NLRB v. KDI Precision Products, Inc.,* 436 F.2d 385, 387 (6th Cir. 1971); *see NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962). It is also well settled that a protest of the suspension of a fellow employee is protected activity. *NLRB v. Imperial Bedding Co.,* 519 F.2d 1073, 1075 (5th Cir. 1975); *NLRB v. Holcombe,* 325 F.2d 508, 511 (5th Cir. 1963). We have recognized, of course, that certain concerted activities may lose their protected character when in conflict with a union's status as exclusive bargaining representative. *NLRB v. Shop Rite Foods, Inc.,* 430 F.2d 786 (5th Cir. 1970).[7] But we explicitly did not hold

that there cannot be circumstances in which an employee or a minority group of employees may engage, without reference of the matter to union processes, in action which is protected under Section 7 though there is an agreement in force

. . . . . .

---

**6.** In *Emporium Capwell,* the Board found that the discharged employees' course of conduct "was no mere presentation of a grievance but nothing short of a demand that the [Company] bargain with the picketing employees for the entire group of minority employees." *Id.* at 57, 95 S.Ct. at 982, *quoting* 192 N.L.R.B. at 185. The Supreme Court agreed and approvingly quoted language from an opinion below to the effect "There could not be a plainer instance of an attempt to bargain respecting working conditions, as distinguished from an adjustment of grievances." *Id.* at 60 n. 10, *quoting* 158 U.S. App.D.C. 138, at 158, 485 F.2d 917, at 937 (dissenting opinion).

The Court went on to hold that despite the strong national policy against racial discrimination in employment, the National Labor Relations Act does not protect concerted activity by minority employees to bargain with their employer over issues of employment discrimination where such bargaining bypasses the exclusive bargaining representative.

**7.** In *Shop Rite* a group of employees walked off the job and picketed their employer to protest the firing of a fellow employee, Bownds, who allegedly had damaged company property to put pressure on the company during negotiations for a collective bargaining agreement. The protesting employees were discharged. The court found that the minority group acted outside the channels of union affairs, notifying the bargaining representative of the walkout only after the event. When the bargaining representative acted he disapproved the walkout and ordered the men back to work. The court noted, in refusing enforcement, that the failure of the group to notify the union representative of their desire to contest Bownds' discharge "could only undermine the goals of democracy in the unions and effective labor adjustment through the bargaining process." *Id.* at 791. In view of the circumstances of this case and the findings below, we perceive no such possibility here.

*Id.* at 791. The Seventh Circuit has recently addressed, in comprehensive fashion, the circumstances in which the Act does not protect concerted employee activity which abandons established grievance procedures and attempts instead to bargain with the employer regarding working conditions on separate terms. *Dreis & Krump Mfg. Co., Inc. v. NLRB,* 544 F.2d 320, 326 (7th Cir. 1976). The court noted that

> [t]he activity of a single employee in enlisting the support of his fellow employees for their mutual aid and protection is as much "concerted activity" as is ordinary group activity,

*Id.* at 328, *quoting Owens-Corning Fiberglass v. NLRB,* 407 F.2d 1357, 1365 (4th Cir. 1969), and that the protections of Section 7 "are not withheld from persons who engage in concerted activity stemming from a purpose contemplated by the Act, but who act neither through nor on behalf of unions," 544 F.2d at 328, unless the employee "deliberately spurns Union auspices and instead attempts to directly initiate negotiations with his employer regarding working conditions." *Id.* at 326, *citing Emporium Capwell.* The Seventh Circuit upheld the decision of the Board that the discharge of an employee who "proceeded alone in his leafletting, without Union sponsorship," violated Section 8(a)(1) of the Act. *Id.* at 328.

We believe the circumstances of Tipton's discharge require a similar conclusion. Despite the Company's attempt to portray Tipton's activity as that of a dissident deliberately spurning union auspices, the ALJ and a unanimous Board found that nothing in the circulation of the petition would undermine the Union's status as the bargaining representative or pose any serious threat to stable relations. The record does not mandate a contrary finding.

We note that under *Emporium Capwell,* the right of an employee or group of employees to present grievances to their employer is not a "protected right" in the sense that it is "an unfair labor practice for an employer to refuse to entertain such a presentation." 420 U.S. at 61 n. 12, 95 S.Ct. at 984. But we find nothing in *Emporium Capwell* or the cases cited therein which indicates that an employer may with impunity discharge an employee for the simple acts of presenting a grievance or peacefully gathering signatures, without resort to coercion, in preparation for presentation of a grievance. Given the Board's finding, supported by substantial evidence, that Tipton's circulation of the petition was not in derogation of the Union's status as exclusive bargaining agent, we agree that Tipton's conduct was protected concerted activity and that the Company's action in discharging him for that conduct was in violation of Section 8(a)(1) of the Act. We enforce that portion of the Board's order relevant to the discharge of Tipton.

### C. *Threats to Other Employees*

The ALJ found "that when Tipton was discharged, Watson told Pate to tell his men, in effect, that anyone else 'instigating' would be fired" and that Pate transmitted the threat. The ALJ concluded that, in context, this amounted to "a threat of discharge should employees engage in protected activity" and, as such, was violative of Section 8(a)(1). The Board affirmed this finding and conclusion. Finding substantial evidence to support this finding, we enforce that portion of the Board's order relevant to the threat of discharge. *NLRB v. J. Weingarten, Inc.,* 339 F.2d 498 (5th Cir. 1964).

ENFORCEMENT GRANTED IN PART, DENIED IN PART.